IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
November 6, 2013 Session

**STATE OF TENNESSEE v. NOURA JACKSON**

**Appeal by permission from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. 05-05757     Chris Craft, Judge**

No. W2009-01709-SC-R11-CD **- Filed August 22, 2014**

The defendant was charged with the June 2005 first degree premeditated murder of her mother. The jury convicted her of second degree murder after a trial in which the evidence was entirely circumstantial. The Court of Criminal Appeals affirmed her conviction and sentence, although the judges on the Panel were not unanimous as to the rationale for the decision. We granted the defendant's application for permission to appeal. We hold that the lead prosecutor's remark during final closing argument at trial amounted to a constitutionally impermissible comment upon the defendant's exercise of her state and federal constitutional right to remain silent and not testify. We also hold that the prosecution violated the defendant's constitutional right to due process by failing to turn over until after trial the third statement a key witness gave to law enforcement officers investigating the murder. The State has failed to establish that these constitutional errors were harmless beyond a reasonable doubt. Therefore, we vacate the defendant's conviction and sentence and remand for a new trial.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal**
**Appeals Reversed in Part; Conviction Vacated; and**
**Case Remanded to the Trial Court**

CORNELIA A. CLARK, J., delivered the opinion of the Court, in which GARY R. WADE, C.J., and JANICE M. HOLDER, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

Valerie T. Corder, (on appeal and at trial), and Arthur Quinn (at trial), Memphis, Tennessee, for the appellant, Noura Jackson.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; J. Ross Dyer, Senior Counsel; William L. Gibbons, District Attorney General; and Amy P. Weirich and Stephen P. Jones, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

## I. Introduction

Noura Jackson ("Defendant") was charged with the June 2005 first degree premeditated murder of her mother, Jennifer Jackson ("victim"). At Defendant's two-week trial in 2009, the prosecution called forty-five witnesses, and three hundred and seventy-six exhibits were introduced. The prosecution's theory at trial was that Defendant's motives for committing the crime were to gain control of the property belonging to Nazmi Hassanieh, her recently deceased father, which was in her mother's possession, and to obtain the proceeds of the victim's life insurance policy and 401(k) account so that she could continue partying and using illegal drugs with her friends—a lifestyle which her mother disapproved of and was taking steps to curtail or end. Defendant did not confess to the crime, and no forensic proof implicated her. The prosecution's case consisted entirely of circumstantial evidence.

Defendant maintained her innocence and exercised her constitutional right to remain silent and not testify at trial. At the close of the prosecution's case, the defense rested without calling any witnesses. The defense attorneys vigorously cross-examined prosecution witnesses, seeking to: (1) impeach their credibility; (2) create reasonable doubt about Defendant's guilt; (3) highlight evidence suggesting that someone else, and perhaps more than one person, committed the murder; and (4) attack the effectiveness of the methods the police used to process the crime scene and the thoroughness of the police investigation of other suspects.

At the conclusion of the trial, the sequestered jury convicted Defendant of the lesser-included offense of second degree murder, and the trial judge later sentenced her to twenty years and nine months. What follows is a more detailed summary of the proof presented at trial.[1] Additional facts presented during the hearing on the motion for a new trial, in connection with Defendant's dispositive claims that the prosecution impermissibly commented upon her federal and state constitutional right to remain silent during final closing argument and deprived her of Due Process by failing to disclose a witness statement before trial or after the witness testified, will be provided in the discussion of those issues.

---

[1] The facts are presented to the extent possible in chronological order not in the order of the witness testimony at trial.

## II. Factual and Procedural History

In June 2005, Defendant, eighteen and working on her high school degree,[2] lived alone with the thirty-nine-year-old victim at 5001 Newhaven Drive in Memphis. The victim had divorced Defendant's father, Nazmi Hassanieh, when Defendant was an infant. In January 2004, Mr. Hassanieh was murdered during a robbery of the convenience store he owned. After his death, the victim attained property belonging to Mr. Hassanieh, which consisted primarily of several cars that the victim and Defendant both drove, many of which were parked in the driveway of the victim's home.[3]

The proof at trial showed that around midday on Saturday, June 4, 2005, the victim called Mark Irvin, her on-and-off again boyfriend since 2003, asking if she could attend church with him the next day and take him out for his birthday. Mr. Irvin declined. Mr. Irvin testified that the conversation ended on good terms, even though the victim seemed "disappointed."

At 5:30 p.m. on June 4th, the victim drove to the home of a friend, Jimmy Tual, and the two attended a wedding and reception together in downtown Memphis. Mr. Tual testified that the victim ate and drank alcohol but was not intoxicated. After the reception, Mr. Tual drove them to a bar, the Cockeyed Camel, where each paid for a drink. The victim's credit card statement, introduced at trial, reflected that her card was used there at 11:06 p.m. and was not used again. Mr. Tual then drove the victim back to her car at his house, and she left his house at 11:30 p.m., stating that she was going home.[4] Mr. Irvin, following up on their conversation of earlier that day, attempted to call the victim on her cell phone around midnight, but hung up before she answered.

The victim's body was discovered in her home shortly before 5:00 a.m. the next morning, Sunday, June 5, 2005. Joe and Rachel Cocke, who lived across the street with Mr. Cocke's mother, Sheila Cocke, were awakened by Defendant banging on their door and

---

[2] Defendant was enrolled in the Gateway Home School program after having previously attended multiple schools, both public and private.

[3] The vehicles belonging to Mr. Hassanieh included a gray Mercedes occasionally driven by the victim, two white minivans, a black Lincoln limousine, and an older white limousine. The victim also owned a Jeep Cherokee driven by Defendant. The record is not clear how the victim gained control of Mr. Hassenieh's former property. Testimony indicated that the victim was not able to obtain clear title to the vehicles, that Mr. Hassanieh's debts exceeded his assets, and that no probate estate had been opened for Mr. Hassanieh at the time of the victim's murder.

[4] The record does not reflect the distance from Mr. Tual's home to the victim's home.

screaming, "My mom, my mom[!] Somebody's breaking into my house[!]" Believing a break-in was in progress, Mr. Cocke grabbed a pistol and ran across the street, with Defendant close behind him. When Mr. Cocke paused before entering the house, Defendant passed him and entered the house first, proceeding to the sunroom at the back of the house, where she called 911. Mr. Cocke looked throughout the house, but did not see any intruders. He asked Defendant where her mother was, and Defendant replied, "[S]he's in her room. She's in her room." Mr. Cocke then walked down the hallway where the bedrooms were located, looked into the victim's bedroom, and saw her "laying on the ground," "naked," "with blood all over her." Mr. Cocke then ran back to his house in order to bring back his wife Rachel, who had also called 911 and was speaking to the operator on her home phone when Mr. Cocke returned. At that point, Mrs. Cocke gave the telephone to her mother-in-law to complete the call and went to the victim's home.

Defendant had remained in her home when Mr. Cocke left, and when Mrs. Cocke entered the house, she found Defendant in the sunroom still speaking with 911, "all curled up," and "rocking and wailing" on the floor. Mr. Cocke stood in the front foyer, where he observed bloody shoe prints and drops of blood on the kitchen floor directly adjacent to where he stood and saw that the window on the kitchen door had been broken. Mrs. Cocke, who had taken the phone from Defendant, returned to the victim's bedroom at the direction of the 911 operator to see if the victim could be revived. Mrs. Cocke found the victim's bedroom by following the "bloody footprints in the hallway." Mrs. Cocke saw "a lot of blood" and quickly realized that the victim was dead, explaining that "[t]he look on her face was fixed and it—and dead." Mrs. Cocke did not touch the victim, and on the recording of the 911 call placed from Defendant's home, which was played for the jury and introduced as an exhibit at trial, Mrs. Cocke can be heard calling out, apparently to someone else, "[D]on't touch anything."

Meanwhile, Defendant was crying and "hysterical," repeatedly asking Mr. and Mrs. Cocke, "[I]s she dead, is she dead?" Defendant then said, "What am I going to do[?] I just lost my dad . . . . Why is this happening to me[?]" Mrs. Cocke did not notice any blood on Defendant. The Cockes stayed with Defendant until the police arrived at around 5:15 a.m.

Memphis Police Officer Russell Tankersley and his partner were the first to arrive at the crime scene. When he entered the house, Defendant came to the door, yelling that something was wrong with her mom. "She's in the back," she said. He and his partner went inside and immediately saw blood on the hallway floor. As he walked down the hall toward the victim's bedroom, Officer Tankersley had to ask a third officer to remove Defendant,

-4-

who was screaming, "my mom, my mom" as she attempted to run back into the bedroom.[5] When Officer Tankersley looked into the victim's bedroom, he had to use a flashlight to see because it was "very dark" inside. After going only one or two feet into the room, the officers saw blood on the bed, blood "right there in the doorway," and the victim lying on the floor in front of the bed. They then backed out of the room and checked the rest of the house. Officer Tankersley noted glass on the kitchen floor, by the door going to the garage. He exited out that door and checked the garage and all of the outside doors, which were locked. The officers then went back to their squad cars and waited for the Crime Scene unit to arrive. Despite the heat—the temperature was already about ninety to ninety-five degrees when he arrived—Officer Tankersley observed that Defendant was wearing a "blue jean miniskirt" and a "long-sleeved" "fleece" or "sweatshirt."

Memphis Fire Department paramedics arrived next at the scene and followed the police into the house. Paramedic Michelle Hulbert found the victim lying on the floor at the foot of the bed, naked, with visible signs of trauma, including stab wounds to her head, neck, and chest. When Ms. Hulbert entered the room, she had to step over a stool to approach the victim, and "there was a basket that was laying over her head and her face" that she had to "remove . . . to examine her body."[6] Ms. Hulbert formally declared the victim deceased at 5:18 a.m., but explained that she was not qualified to determine the actual time of death. Ms. Hulbert testified that, although the victim's body was cool to the touch, there was no indication of rigor mortis in her wrists. Ms. Hulbert did not measure the victim's core temperature.

Ms. Hulbert explained that she did a basic visual assessment of Defendant, who was standing on the curb in front of the house, crying. Ms. Hulbert did not see any evidence to suggest that Defendant was under the influence of any drugs or disoriented. Ms. Hulbert recalled that when the police asked Defendant if she had any idea who perpetrated the murder, Defendant responded that "her mother's boyfriend was an asshole[,] but [even] he wouldn't do something like this." During this time Defendant also told the police that she was tired and wanted to sleep.

---

[5] Officer Tankersley did not recall seeing the Cockes at the Jackson house, and instead recalled seeing only Defendant and "one girl that was on the scene and I don't know to this day what she looked like or who she was." Officer Tankerslsey also recalled the Cockes telling him that Defendant had called 911 from their house.

[6] During their testimony, neither of the Cockes mentioned seeing a basket over the victim's head.

The Memphis Police Department's Crime Scene Investigation ("CSI") unit arrived at the scene around 5:45 a.m. Crime scene tape had not yet been put up, although it was up by 6:30 a.m. From the time Officer David Payment, the head of the CSI team arrived at 5:45 a.m until the time he left at 3:00 p.m., he documented in his crime scene log that twenty-two people entered the house. Officer Payment first walked the perimeter of the residence and noticed what appeared to be blood and glass on the kitchen floor, as well as possible blood on the front porch and foyer, front door, and the floors of the living room, hallway, shared bathroom off the hallway, and the victim's bedroom. A substance that appeared to be blood had soaked the sheets and pillows on the victim's bed, was spattered on the closet door next to the victim's body, was smeared on the wall by the light switch, and was pooled on the floor under and surrounding the victim. Given the nature of the crime scene and the extent of blood throughout the house, Officer Payment requested that special equipment and three additional officers be dispatched to the scene. The CSI unit and police requested that the Medical Examiner, in particular the blood spatter expert, come out and evaluate the scene, but no one from the Medical Examiner's office ever came. In an attempt to lift and preserve what seemed to be bloody footprints in the hallway, the CSI unit used chemical products[7] they had not previously used and had not previously been trained to use. The CSI team also used a Krime Sight Imager, a "non-invasive body fluid fingerprint detection" device, throughout the victim's house, but no fingerprints with ridge details were detected.

In addition to taking over 200 photographs[8] of the scene and attempting to lift the bloody footprints, the CSI unit documented and collected a great deal of physical evidence from the scene, including a pair of gold sandals found in the foyer by the front door; two drinking glasses located on the kitchen counter; a knife block found in the kitchen with three empty knife slots;[9] one knife found by the kitchen sink; and another knife found farther along the kitchen counter, beneath a golf club.[10] A third knife was also collected from the scene.

---

[7] These products were referred to at trial as Coomassie Blue and Hungarian Red. No witness testified as to the effectiveness of these products, the training required to use them, or the frequency of their use in crime scene investigations. Officer Payment testified, however, that he had never used these products before June 5th and had not used them since that day because he did not believe they preserved the evidence effectively.

[8] Sergeant Helldorfer testified that 810 photographs of the crime scene were taken by the CSI and homicide units combined.

[9] Officer Payment testified that there were two empty slots in the knife block, but the photograph of the knife block revealed three empty slots.

[10] Mr. Irvin testified that the golf club was his and that he must have left it with the victim by mistake after golfing months earlier. The golf club tested negative for blood. Police asked Mr. Irvin to provide them with DNA samples, which he agreed to do, but none of his DNA was discovered at the crime scene.

In a hallway bathroom that the victim and Defendant shared, the CSI team photographed a hair dryer on the floor near strands of hair and a substance that appeared to be blood. However, the CSI team did not inventory the contents of the trash cans in the hallway bathroom and the victim's bedroom.

In the victim's bedroom the CSI team collected an array of evidence, including a stool next to the victim's body; possible hair from that stool; the victim's bed, including the headboard, footboard, the entire frame, mattress, and all of the pillows and bedding; a wicker basket; and a shoe box containing shoes. After the victim's body was removed, the team also discovered and collected a blue condom wrapper from the floor near the bed, in the northeast corner of the bedroom.

The CSI unit took special care when collecting the bedding, aware that since the victim had been stabbed multiple times "it was quite likely to find blood of the attacker in the bed." Police officers also photographed multiple purses belonging to the victim which were found on the floor of the master bathroom with their contents spilled onto the floor. The victim's house keys were not found, and her wallet was not found near her purses. The victim's half-brother, Eric Sherwood, later found a wallet belonging to the victim in a plastic bin in the sunroom and turned it over to the police. The wallet contained credit cards that had not expired and also contained an identification card issued to the victim by a former employer located in Atlanta, Georgia.[11] A computer in the sunroom was also taken into evidence and later determined not to have been used by anyone during the time the prosecution believed the murder occurred. Information gathered suggested that the victim often kept a spare key to her home underneath a flower pot on the front porch, but the key was not recovered, and photographs taken of the flowerpot suggested that it had been moved.[12]

The head of the CSI team used a flashlight to look into the windows of the cars in the driveway, but did not look inside or examine the interiors of any vehicles. No photographs or inventories were taken of the interiors of the cars on the morning of the murder. Later that

---

[11] Mr. Sherwood testified that he found the wallet after the murder. On direct examination Mr. Sherwood testified that the wallet contained the victim's driver's license, social security card, and two or three other cards. However, on cross-examination he identified the wallet as one "my sister used to carry," and identified as belonging to the victim a First Tennessee First Check Card Debit Card; a Visa card due to expire on 02/07; a Social Security card issued to the victim; Focal Company cards with the victim's name on them; and a AAA Autoclub South card with Defendant's name on it that expired in 05/06. The victim's driver's license was not among the cards entered into evidence.

[12] Testimony revealed that the victim, Defendant, Mr. Irvin, and Mr. Sherwood had keys to the victim's house.

morning, Sergeant Thomas Helldorfer looked into the window of Defendant's car. Because he saw no blood or evidence of any weapon, the vehicle was released to Defendant later in the afternoon of June 5, 2005.

Additional surveys of the house and its environs were performed by police officers throughout the day on June 5, 2005, and on the following day, as officers attempted to process what they considered an "unusual scene." The house contained "so much property" that the police made a video, contrary to standard procedure, before removing any evidence. While some rooms were relatively orderly, others were a "mess," and the victim's family members described her at trial as a "packrat" who was in the midst of trying to reorganize her belongings at the time of the murder.

During his survey of the crime scene mid-morning on June 5, 2005, Sergeant Helldorfer noticed that the surfaces of the shower and sink in the hall bathroom, apparently shared by both women, were wet, although none of the more than 800 photographs of the crime scene documented Sergeant Helldorfer's observations. The CSI unit did not find any visible traces of blood in the bathroom, however, nor did the Krime Sight Imager reveal the presence of blood. Sergeant Helldorfer also noted that the hole in the glass of the kitchen door leading to the garage lined up with an interior butterfly lock not visible from the outside of the door.

Another police officer noted a box of condoms in Defendant's room, as well as condoms in the drawer of a bedside table in the victim's room. However, the condom wrapper found on the floor by the victim's bed was not the same brand as those found in the victim's bedside table.

Lieutenant Mark Miller, the case coordinator, found two cordless phones in Defendant's room and recorded the numbers recently dialed from the home phone number. The last number was for the cell phone of Andrew Hammack, a friend of Defendant's. He also examined Defendant's cell phone, on which the last number was also Mr. Hammack's. In addition to temporarily retaining her cell phone, police also retained Defendant's purse during the morning of June 5th, retrieving from it a receipt from a nearby gas station. Both Defendant's purse and cell phone were in the house when police conducted their search of the premises.

Early in their investigation of the scene, the police asked Defendant to sign a "Form for Consent to Search" authorizing them to enter and search the house. However, Defendant did not immediately sign the form, instead asking to speak to Genevieve Dix, a friend of the victim, who had arrived at the scene and whom Defendant knew to be an attorney. Ms. Dix arrived at the house before 8:00 a.m. and found Defendant sitting on the grass in front of the

house. She first noticed Defendant's outfit, particularly a "long[-]sleeved gray" "sweatshirt thing" that she found "very odd" for a girl who was always "fashionable." Defendant stood with her sweatshirt "pulled down . . . to her knuckles" and kept her arms "straight at her side" when Ms. Dix hugged her. Ms. Dix also noticed that although Defendant was a smoker, her hair was "fresh and sweet smelling" and that she had no makeup on, even though she usually wore heavy eye makeup. Defendant told Ms. Dix that the victim had called her and told her to come home, continuing "but you know me, I didn't, and [Defendant] said [she] came home about four o'clock. And then [Defendant] just stopped and didn't say anything else."[13]

A few minutes later, while Defendant was speaking with detectives, Ms. Dix was informed that Defendant wanted to speak with her and asked why she might be needed. Ms. Dix explained that she was an attorney but that she "was not [there] in that capacity." The detective then took her to Defendant and showed her the "Form for Consent to Search" that the police wanted Defendant to sign. Rather than sign the form, Defendant told Ms. Dix, "I want to talk to you," and the two women walked fifteen to twenty feet away from police. Ms. Dix testified that she told Defendant several times that she was not a criminal lawyer, did not know anything about the form, and did not represent her. She said that Defendant persisted in asking her about the form regardless, demanding to know whether the police could "get in [her] car?" Ms. Dix informed Defendant that it was likely that "sooner or later, they're going to get into everything," and that they would get a search warrant if Defendant did not cooperate. When Ms. Dix asked Defendant why she was so concerned about the police getting into her car, Defendant replied that she had a "bong pipe" in her Jeep, and wondered if she would "get in trouble." Ms. Dix replied that she did not think that the police would "give a rip" about the pipe, given that Defendant's mother was dead. Ms. Dix described Defendant as an "extremely bright individual" who could comprehend Ms. Dix's advice. Defendant decided to sign the form after speaking with Ms. Dix for a few minutes. The form itself, introduced into evidence at trial, reflects that Defendant signed it at 7:51 a.m. Ms. Dix signed it as well.[14]

After Defendant signed the form, Sergeant Connie Justice drove Defendant to the Memphis police station at 201 Poplar Avenue so that she could give a formal statement. Since Defendant had found the body, this was normal police procedure, and Defendant was neither Mirandized nor handcuffed. Rather, she sat in the front of the police cruiser, quickly

---

[13] Defendant's neighbor, Sheila Cocke, also sat and talked with Defendant soon after the police arrived, and she testified that when the police asked where she had been, Defendant "never gave the same answer twice."

[14] Ms. Dix insisted during her testimony at trial that she signed the form "as a witness only" and the form reflects that Ms. Dix signed in the lines designated for "Witnesses."

fell asleep, and remained asleep for the duration of the fourteen-minute drive. Sergeant Justice woke Defendant when they arrived, at which point Defendant sat with Sergeant Justice and gave a statement.

Defendant told Sergeant Justice that she had gone to the Italian Festival the previous evening, then to a party at Carter Kobeck's house, and then to the house of her boyfriend, Perry Brasfield. She said that she had last spoken to her mother at 12:10 a.m. that morning. After speaking to her mother, Defendant said she had remained at Mr. Brasfield's house for another thirty minutes before a friend drove her back to her own car. Defendant said she then stopped and bought cigarettes and went to Taco Bell, but realized she did not have her wallet. She called Mr. Brasfield and asked him to look for her wallet. Next, she went back to Mr. Kobeck's house and found her wallet there. After leaving Mr. Kobeck's house, Defendant said she bought gas and told Sergeant Justice that she had the receipt for the purchase. Defendant stated that she next drove to Eric Whittaker's house in Cordova, but decided to head home after speaking to him briefly. She then spoke to Mr. Hammack, who was supposed to come over to her house to see her new kitten, but she did not call him after she got home and discovered her mother's body. Defendant said that she arrived home between 4:00 and 5:00 a.m.

Defendant stated that when she arrived at home she finished smoking a cigarette, threw the butt in the flower bed, and used her key to enter the front door, which was locked. When she first came into the house, Defendant turned on the light in the hallway, although she noticed that the light in her mother's bathroom was on and her bedroom door was open, both of which Defendant characterized as "weird," explaining that the victim usually slept with her door closed and the light off. She first went into the kitchen to get her cat but stepped on glass and quickly realized that it was all over the floor. She then walked into her mother's room, "took the basket off of her head," tried to talk to her and attempted to find a pulse, but found none. Defendant later stated that she had touched her mother's arms and face when she found her. Finding her mother unresponsive, she "kept shaking her" but soon ran to the neighbor's house screaming, and Mr. Cocke followed her back to her house. Defendant said that her mother kept her purse to the left side of her bed, had a nice cell phone, and usually kept cash in her wallet. Defendant said that her mother usually slept in a big t-shirt, but sometimes slept in her underwear.[15]

In response to Sergeant Justice's questions, Defendant further stated that she and her mother recently had a disagreement over a party Defendant's boyfriend, Mr. Brasfield, had thrown at their house, and Defendant said that the victim "was disappointed with [Mr. Brasfield] cause [sic] she trusted him." Defendant described her disagreements with her

---

[15] Mr. Irvin testified that the victim would occasionally sleep in the nude during the summer.

-10-

mother as "the same kind that teenagers and mothers [have]." She said that the victim had an "on and off again boyfriend," Mr. Irvin, but that they were broken up and the victim had gone to a wedding with Mr. Tual the previous evening. The victim's arguments with Mr. Irvin, Defendant said, were only "heated words" and not physical. Defendant also mentioned that her mother had recently made an enemy at work over an account.

When asked about a cut on her left hand between her thumb and forefinger, Defendant said she had cut her hand at the Italian Festival on Friday night when she tripped and fell on a broken beer bottle. She said that her mother had purchased "New Skin" adhesive for her to treat the cut. Defendant said the cut had not required stitches, but Defendant neither offered to show Sergeant Justice the cut, nor did Sergeant Justice specifically ask to see it. According to Sergeant Justice, Defendant did not appear to be intoxicated or under the influence of any drugs at the time of the interview.

Defendant signed her statement at 9:53 a.m. on June 5, 2005. After giving her statement, Defendant told Sergeant Justice that some of the receipts from her activities from midnight until the time she discovered her mother's body might be in her vehicle. At 10:50 a.m., at the request of detectives from the crime scene, Sergeant Justice had Defendant sign forms consenting to a search of the cars in the driveway and permitting the police to obtain DNA samples from Defendant, including "hair samples, blood samples, and/or saliva samples." At 11:05 a.m. Sergeant Justice accompanied Defendant to the Tennessee Bureau of Investigation, a few floors away in the same building, so that a full set of her fingerprints could be taken. At 11:25 a.m. Sergeant Justice photographed Defendant's hands, shoes, and clothes. The photographs showing Defendant's hands depict an apparently intact manicure and a small piece of white tape, with no absorption pad, covering the cut on Defendant's left hand. Sergeant Justice confirmed that such photographs are routinely taken during the investigation of a murder by stabbing because if the person perpetrating the crime hits a bone while stabbing the victim, the perpetrator's hand may continue to slide down the blade of the knife, thus cutting the attacker's palm. Overall, Defendant remained at the Memphis police station for approximately four hours on the morning after the victim's body was discovered.

When Sergeant Justice returned Defendant to the crime scene at 12:15 p.m., the police located her new kitten in the garage and helped her retrieve her dog from the back yard. Soon afterward the police returned her purse, keys, and cell phone, telling her that she could take her vehicle as well if she wished. At this point Sergeant Justice took Defendant's gray New Balance sneakers, as the shoes had blood on them. Defendant had been wearing the sneakers all morning, including during her trip to the police station. Defendant was given other shoes from inside the house to wear.

By the time Defendant returned to the crime scene, several of her friends, including Mr. Brasfield, had arrived. When Mr. Brasfield asked Defendant about the bandage on her hand, Defendant told him she "was in her house chasing her kitten through the kitchen and cut it on some glass, some broken glass." Defendant spoke with Ms. Dix again as well. Ms. Dix questioned Defendant about Mr. Brasfield's statement that Defendant had called him from her house around 12:30 or 1:00 a.m. Defendant denied that she had been home earlier, insisting that while the victim had called and told her to come home, when she drove by the house and saw the lights were off, she assumed the victim was asleep and drove to a boy's[16] house where she smoked pot with him, not returning home until after 4:00 a.m.

Shortly after Defendant returned to the scene, a friend of the victim, Patty Masterson, approached Defendant and hugged her. Ms. Masterson recalled Defendant asking her if "all of this is going to be on the news[.]" When Ms. Masterson, who noticed that Defendant was wearing a long-sleeve white shirt underneath a long-sleeve grey sweatshirt, asked Defendant if she was hot, Defendant removed the long-sleeve grey sweatshirt and threw it to the ground. Ms. Masterson picked it up and turned it over to the police.

By this time, members of the media and various onlookers, as well as family friends, had begun to gather outside the house. When Regina Hunt, a friend of the family, approached her, Defendant said that she "felt uncomfortable" around all of the victim's friends in the area and wanted to leave. Before Defendant left with Ms. Hunt, however, a friend of Defendant's testified that she saw Defendant sitting in Ms. Hunt's car with a plastic bag full of Lortabs in her hands. Ms. Hunt drove Defendant to a nearby restaurant that Ms. Hunt owned, where they went into her office to eat after Defendant saw Mr. Brasfield and two other of her friends in the dining area of the restaurant. After eating, Defendant and Ms. Hunt returned to the crime scene, where Defendant asked the police if she could retrieve her bag[17] from her Jeep. The police allowed her to do so.

Around this time Defendant's friend Caroline Giovannetti arrived, and Defendant asked if Ms. Giovannetti would care for her dog and if she could shower at Ms. Giovannetti's house. When she agreed, Ms. Hunt drove Defendant to Ms. Giovannetti's house. Defendant went to the back of the house to shower and returned a short while later, her hair wet but smelling of marijuana. Ms. Giovannetti packed Defendant a bag of clothes to wear, since Defendant's own clothes were at the crime scene and inaccessible. When Ms. Giovannetti asked about the previous night, Defendant said that after returning to her car from a party with

---

[16] Ms. Dix testified that Defendant mentioned the name of a boy Ms. Dix did not know and could not recall; it was a "very short name, like four or five letters."

[17] The record does not reflect what was in the bag.

friends, she had driven past her house around midnight, seen the lights all out, assumed her mother was asleep, and proceeded to drive to Mr. Whittaker's house, coming home to find her mother between 4:00 and 5:00 a.m. Defendant "didn't answer" when asked about the cut on her hand. Ms. Hunt and Defendant then left for Ms. Hunt's house, followed by Defendant's friends in two other cars. On the way, Defendant asked Ms. Hunt to drive by Memorial Park, the cemetery where Anna Menkel, Defendant's good friend who had died six months earlier, was buried. There, Ms. Hunt witnessed Defendant "sobbing" at her friend's grave.

Ms. Hunt then drove Defendant to her own home, where Ms. Hunt ordered pizza and many of Defendant's friends gathered to comfort her. One friend described Defendant as upset but "not overly upset." When they first arrived at her house, Ms. Hunt asked Defendant about the cut on her hand, and Defendant replied that "she had cut it on a beer bottle at Italian Fest" on Saturday night. Defendant reiterated a version of this explanation later in Ms. Giovannetti's presence, commenting, "[O]h Caroline, you saw me, you saw how drunk I was." Although Ms. Giovannetti testified that she had seen Defendant at the Italian Festival on that Friday evening, June 3, 2005—rather than Saturday evening—she did not recall Defendant appearing to be drunk or noticing that Defendant had hurt her hand.

While talking with Ms. Hunt and other friends, Defendant declared that she "wanted to have a party." Ms. Hunt told her that this would not be a good idea. Defendant then said that she wanted to go to the movies. Ms. Hunt responded that Defendant was not going anywhere and needed rest. Ms. Hunt allowed Defendant's friends to remain at her house until around 11:00 p.m. that evening, and Defendant stayed with Ms. Hunt that night. During this time, Ms. Hunt looked through Defendant's purse and discovered "a prescription bottle with someone else's name on it," and twelve to twenty pills "with little speckles" and the name "Concerta" on them. When Ms. Hunt confronted Defendant about the pills, Defendant at first claimed that the pills had been prescribed for her by her doctor but ultimately confessed that they were drugs she had obtained from someone at Ridgeway High School.[18]

On the morning of Monday, June 6, 2005, Ms. Hunt asked Defendant where she had been on the night of the murder, but Defendant offered conflicting stories. First, Defendant claimed that she had gone home but then had sneaked back out again. Defendant later stated that she had driven by her house but decided not to go home. "She got very defensive when I corrected her that her story was different," Ms. Hunt recalled.

On this same morning, Sergeant Justice called Ms. Hunt's home and spoke with Defendant to clarify the location of the Taco Bell where Defendant said she had stopped on her way home the morning of June 5th. During this conversation, Defendant admitted to

---

[18] Defendant had attended Ridgeway High School in the past and still had friends there.

Sergeant Justice that she had not stopped at Taco Bell, but instead "rode around and smoked a bowl of weed" and had been too ashamed to say so before. After speaking with Sergeant Justice, Defendant asked Ms. Hunt if she were a suspect in the murder. When Ms. Hunt replied that, given the early stage of the investigation "everyone was a suspect," Defendant declared that she "touche[d] her mother, she hug[ged] her mother, [she was] all over her mother." When Ms. Hunt reassured her that the police would find the killer, Defendant replied in a tone that Ms. Hunt described as "real sharp" and "very cold," "[W]ell, they didn't find out who killed my dad."

Later that same morning, Defendant declared that she wanted to go tanning and shopping. When Ms. Hunt refused to accompany her, Defendant called another family friend, Ms. Kathy Menkel, the mother of Defendant's deceased friend. Ms. Menkel picked up Defendant from Ms. Hunt's house and took her out. Defendant spent Monday night at Kathy Menkel's house.

On Tuesday morning, June 7, 2005, Defendant called Sergeant Justice, asking if there were any developments in the investigation. Defendant never called Sergeant Justice again. That same day, the police obtained DNA samples from Defendant's friend, Andrew Hammack. It was also on Tuesday that Ms. Hunt drove Defendant to the Memphis hotel where Defendant's aunts, her mother's sisters Cindy Eidson and Grace France, were staying.[19] As they drove to the hotel, Ms. Hunt again asked Defendant about the cut on her hand. This time, Defendant said that "her cat was stuck in the garage and she cut [her hand] trying to get the cat out of the garage." When Ms. Hunt pointed out that this was a different explanation than Defendant had given before, Defendant "got defensive, and then she started saying that she wanted to kill herself." Defendant was crying and saying, "I just want to die. I want to kill myself." At this point Ms. Hunt attempted to console her and brought her to her aunts.

Ms. France suggested that she and Defendant go see the police and get an update on the investigation, but Defendant refused to go. Ms. Eidson testified that she asked Defendant about the night of the murder, and Defendant told her that "[Mr. Brasfield] had called [her] and [she] was with this fellow Chris, and [Mr. Brasfield] hates Chris[,] and so [she] didn't want to tell him [she] was with him, and so, [she] said [she] was at home, smoking a cigarette." Then Defendant said that the night was too painful to talk about. Ms. France took Defendant shopping for clothes during this period. She noticed that Defendant was wearing

_____

[19] Defendant notified Ms. France of the murder on June 5th, shortly after the police arrived at the crime scene. Ms. France then notified Ms. Eidson, who was in Portugal for a vacation. Ms. France arrived in Memphis on Monday, June 6th, and Ms. Eidson returned to the United States immediately upon learning of the victim's murder, arriving in Memphis on Tuesday, June 7th.

a "polar fleece type jacket," and that during the shopping trip, Defendant chose all long-sleeved shirts and a long-sleeved nightgown, even though it was extremely hot in Memphis at the time.[20] Defendant also told Ms. France that the victim had bought her some New Balance sneakers while they were in Florida and that she wanted them back, which Ms. France thought was an odd request, given that the shoes had blood on them and were part of the murder investigation.

On Wednesday, June 8, 2005, Defendant was hospitalized.[21] Although Defendant attended her mother's funeral, she otherwise remained hospitalized for about a month. On the day of her mother's funeral, Friday, June 10, 2005, the police visited Defendant at the hospital and photographed her body and also took more pictures of her hands.

When Defendant's uncle, Mr. Sherwood, visited Defendant in the hospital and asked if she knew anything about her mother's murder, Defendant "just basically put her head down and wouldn't say anything." When he asked her about the cut on her hand, she said she cut it on barbed wire at the Italian Festival when jumping a fence. During a later conversation with Mr. Sherwood, Defendant claimed to have burned herself on a stove. Ms. Hunt also visited Defendant at the hospital and brought a picture of the victim and Defendant as a child. Defendant only commented on how "disgusting" the pantyhose were that the victim wore in the picture, according to Ms. Hunt, and seemed more interested in having Ms. Hunt contact Mr. Brasfield for her than in the victim's murder. Ms. Hunt also testified that there was tension between Defendant and her aunts over money, specifically how much Defendant would be allowed to spend on apartment rent once she was released from the hospital. Regarding one potential apartment, Defendant told Ms. Hunt that she "wasn't living in that piece of shit" and said her aunts "were keeping her money from her. That the cars were hers, the money was hers, and they were keeping it from her."

On June 12, 2005, Mr. Hammack's friends brought in a pair of New Balance sneakers to the police station, claiming that he had been wearing them the weekend of the murder and informing police that they could not account for his whereabouts on the night of the murder.

---

[20] Although the prosecution was careful to elicit testimony about Defendant's long-sleeved clothing in the aftermath of the murder, there was no evidence that Defendant sought to hide any marks on her body. No other explanation was presented for Defendant's unusual choice of clothing.

[21] The trial court granted Defendant's motion and did not allow the prosecution to offer evidence about the cause of her hospitalization or the name of the facility in which she was hospitalized. The record reflects that Defendant was hospitalized at Lakeside Behavioral Health System, known in the Memphis area as a treatment facility for mental illness and substance abuse. Despite the trial court's ruling, at least one prosecution witness mentioned Defendant was hospitalized at Lakeside. The trial court overruled the defense motion for a mistrial, made after this mention occurred.

The police took pictures of the shoes and returned them. The shoes were never collected into evidence or tested in any way. Lieutenant Miller described Mr. Hammack's friends as "slightly incoherent" and behaving as if they had been smoking marijuana.

On June 17th, the police obtained a warrant and searched Defendant's Jeep Cherokee. They found two Walgreens bags, one containing several first aid supplies, including Nexcare First Aid Gentle Paper Tape, an empty box of Nexcare Bandage Drops Liquid Bandage, Skin Shield Liquid Bandage, loose change, and a brown paper towel. The police also found a white skirt among the "tons" of clothes and many other items in Defendant's car.[22]

After Defendant was released from the hospital in early July, she stayed with Mr. Sherwood for one night and then stayed with Rebecca Robertson, Mr. Sherwood's friend. Ms. Robertson lived at and was the assistant manager of the Quail Ridge Apartments, where Mr. Sherwood also worked. Defendant stayed with Ms. Robertson for a period of time before moving into her own two-bedroom apartment at the Quail Ridge complex.[23] During the time she stayed with Ms. Robertson, Defendant often went out with friends. When Ms. Robertson asked her about the cut on her hand, Defendant said that she cut it at Italian Festival, but refused Ms. Robertson's offer to treat the wound to keep it from scarring and did not want to discuss it. During this period and after she moved to her own apartment, Ms. Eidson and Ms. France provided for Defendant financially. Mr. Sherwood brought furniture from the victim's house to Defendant's new apartment. Defendant told him that she did not want to return to the house. When he asked her if she would get a job, Defendant informed him that she would just "go into selling pills or whatever."

Once she was established in her own apartment, Defendant often had friends over for parties. Several friends testified that they drank at her apartment, regarding it as "a place to drink" where no parents were around to supervise. One witness testified that she saw people

---

[22] The Jeep had been in Defendant's control since the afternoon of June 5th, when the police returned the keys to her. Officer William D. Merritt, who assisted with the investigation, testified that the police found the Jeep in the driveway of the victim's house. There, they did an initial search and discovered the Walgreens bags, at which point they brought it to a police facility for a formal search. Officer Merritt observed that the Jeep "had been moved around" since the day of the murder, although it was unclear who had moved it or if it ever left the crime scene area.

[23] The record is unclear as to how long Defendant stayed with Ms. Robertson. Ms. Robertson's dates also conflict with those of other witnesses. While other witnesses testified that Defendant stayed at Lakeside for a month and thus through early July, Ms. Roberston testified that Defendant stayed with her for several weeks beginning in mid-June.

-16-

smoking marijuana at the apartment, and Mr. Brasfield stated that he saw Defendant take Lortabs and snort cocaine at her apartment.[24]

Defendant often visited Ms. Robertson while Ms. Robertson was working in the management office of the Quail Ridge complex. During one such visit, Ms. Robertson recalled Defendant becoming "very uncomfortable" when she saw the police arrive at the apartment complex. Defendant asked, "[A]re they here for me?" Ms. Robertson explained that the police had been called to deal with a problem caused by another tenant.

By the end of the summer of 2005, Defendant was evicted from her apartment for causing disturbances, not following the lease, and having an unauthorized pet. She had lived in the apartment for only a few weeks or a month before her eviction. When he helped to pack up Defendant's apartment, Mr. Sherwood noticed three to four pills on the counter, as well as a clear plastic straw with white residue, the latter of which he put in a bag and gave to a family member.

It is not clear where Defendant stayed after her eviction from the Quail Ridge Apartments, although the record indicates that she worked as a babysitter that summer. Defendant was arrested and charged with homicide for her mother's murder on September 29, 2005. After her arrest, Defendant called Ms. Eidson from the police station. When Ms. Eidson said, "Noura, tell me where you were and who were you with when Jennifer was murdered," Defendant responded, "I don't know. I don't know." Defendant never contacted Ms. Eidson again.[25] Defendant also called Ms. France after her arrest, asking if Ms. France would contact the family for which she had been babysitting and get the money they owed Defendant. When Ms. France responded by asking her questions, including one about the cut on her hand, Defendant told her that "any doctor would tell you that was a burn. I burned it cooking macaroni and cheese."

Dr. Karen Chancellor, the chief medical examiner for Shelby County, testified at Defendant's 2009 trial. Dr. Chancellor said she received the victim's body around 4:00 p.m. on June 5th and performed the autopsy on June 6, 2005. Dr. Chancellor described the victim

---

[24] Mr. Brasfield was also permitted to testify that, at one point in the months following the murder, Defendant telephoned him one night from outside his window. At his suggestion, she climbed into his window, and they had sex. According to Mr. Brasfield, they had sex several times at Defendant's apartment.

[25] Mr. Sherwood and Ms. France admitted that, within a year of the murder, they and Ms. Eidson had brought a civil suit against Defendant to prevent her from inheriting from the victim.

as approximately five feet, ten inches tall and weighing 166 pounds.[26]  During the autopsy, Dr. Chancellor discovered a small amount of alcohol in the victim's blood (.07), as well as traces of Benadryl.  Dr. Chancellor determined that the victim's death was caused by multiple stab wounds, explaining that the victim sustained fifty or fifty-one stab wounds to her chest, abdomen, back, neck, and arms, and many cut wounds to various parts of her body.[27] Although Dr. Chancellor could not determine the order in which the wounds were inflicted, she opined that the knife was held at a ninety-degree angle to the victim's body when the chest wounds were made.  The chest stab wounds passed through the right and left ventricles of the victim's heart and penetrated the victim's sternum.  Dr. Chancellor explained that penetration of the sternum would have required more pressure, but not a great deal of force as long as the attacker used a sharp-edged instrument.  The abdominal stab wounds involved the victim's stomach, liver, and aorta; the stab wounds to the front of the victim's right shoulder involved her right lung.  One of the seven or eight "side to side" stab wounds on the victim's neck lacerated her larynx.  The victim had sharp force injuries on her forehead and cheek, as well as a cut wound on her chin with a pattern indicating that it was inflicted with a serrated edge. The victim sustained stab wounds to her left shoulder, both hands, right arm, and right wrist, as well as cuts on the back of the fingers of her left hand and on the palm of her right hand. Dr. Chancellor opined that the injuries to the victim's hands, particularly the palmar surface injuries, were consistent with defensive wounds.  In addition to the stab and cut wounds, the victim had a contusion on the left side of her head, which Dr. Chancellor described as a recent injury caused by a blunt object.

Evidence introduced at trial provided only general information about the murder weapon, which was never discovered.  The maximum depth of the victim's stab wounds was six inches, meaning the knife used was at least six inches long.  Dr. Chancellor estimated the width of the knife as one-half to three-quarters of an inch.  However, she could not determine the height of the assailant from the nature of the wounds.  Based on the nature of the wounds, Dr. Chancellor opined that two knives may have been used in the assault.  A forensic anthropologist who assisted Dr. Chancellor with determining the type of knife used in the assault concluded that the stab wounds to the victim's ribs were inflicted by a non-serrated, sharp-edged weapon.  However, Dr. Chancellor said that she could not "imagine anything else other than a serrated knife" causing the cut wounds to the victim's neck and jaw.  Dr. Chancellor opined that either two knives were used in the assault or a single knife with an unusual configuration of both a sharp edge and a serrated edge was the murder weapon.

---

[26] Photographic evidence introduced at trial demonstrated that Defendant was significantly shorter than the victim.

[27] Dr. Chancellor explained that a cut wound "is generally longer on the surface of the body than it is deep," while "[a] stab wound is generally deeper into the body than it is in the width on the skin."

Dr. Chancellor admitted that the CSI unit contacted her office and asked for a blood spatter expert to look at photographs from the crime scene, but she did not know if any photographs were ever sent. Dr. Chancellor did not recall the police asking anyone from her office to come to the scene.

Analysis of fingerprints collected at the scene failed to identify a perpetrator or link Defendant to the crime scene. Fingerprints found on the kitchen glasses matched those of Koale Madison, a friend of Defendant's who admitted to being in the house on June 4th and drinking water from a glass in the kitchen. Although prints or partial prints were found on other items, including a Skin Shield box, the condom wrapper, the kitchen door, and footboard, no other prints could be identified. The print on the condom wrapper was not that of either Defendant or the victim, and Defendant's prints did not match those found on the interior glass of the kitchen door. The three knives found at the scene were not processed for fingerprints.

Similarly, no DNA evidence linked Defendant to the crime scene. Dr. Qadriyyah Debnam, the Tennessee Bureau of Investigation ("TBI") forensic scientist who performed the analysis, reported that, while the tests of the victim's sexual assault kit were negative for semen, blood of unknown individuals who were neither the victim nor Defendant was present in the victim's bed. Testing of stains on the top sheet revealed a complete DNA profile of an unknown female mixed with DNA that could be a match to the victim's. The former was a "major contributor" of DNA, likely derived from blood, while the victim "c[ould] not be excluded as a minor contributor" to the second strain of DNA discovered, which could have been saliva, skin cells, or blood. Stains on a pillowcase found on a pillow near the headboard contained DNA matching the victim's as well as the DNA of another individual who was not Defendant.[28] Testing of stains located on a bedpost of the victim's bed yielded a partial DNA profile consistent with a mix from the victim and an unidentified person who was neither Defendant nor the unidentified person whose DNA was discovered on the top sheet. Otherwise, DNA testing of the blood found throughout the victim's room and the house, including that found on the wicker basket, stool, bedding, closet wall and light switch in the victim's room, on the front porch and front door, and on the broken glass from the kitchen door as well as the bloody footprints found in the hallway, showed that the blood either matched or was consistent with the victim's DNA profile.

Defendant's DNA was not located on any of the crime scene items that were tested. Long, blond human hairs collected from the victim's hands were not tested by the TBI or

___

[28] Dr. Debnam offered the opinion that the victim's DNA "more than likely" came from blood, although the other individual's DNA could have come from saliva, skin or blood. She also testified that she has no way of determining when DNA had been deposited on a surface.

otherwise identified. Only the victim's own DNA was found underneath her fingernails.[29] No DNA testing was performed on the condom wrapper, as the process used to lift the fingerprint made a DNA test impossible. No blood was found in Defendant's car or on the clothing she was wearing when police arrived at the scene. Additionally, no blood was found on the white skirt found in Defendant's car, nor was blood discovered on the gold sandals found near the front door of the victim's home. The victim's blood was found on Defendant's grey New Balance sneakers, however, which Defendant was wearing on the morning her mother's body was discovered. Defendant's blood was discovered only on a napkin found in the pocket of the grey sweatshirt Defendant was wearing when she discovered the victim's body.

The footprint evidence was not of a sufficiently good quality to enable the State's footprint expert, Dr. Linda Littlejohn, to make any specific identifications. CSI team photographs of the footprints were taken at an angle and, as a result, were "not examination quality"; therefore, Dr. Littlejohn could only do a "visual comparison." The footprint evidence, preserved using chemical products the CSI team had never used before, failed to produce any viable results.[30] Nine of the footprints Dr. Littlejohn analyzed had a "similar tread design" to Defendant's New Balance shoe, but could not be matched to any individual shoe. Dr. Littlejohn also opined that one gel lift of a footprint "could be" a print left by a New Balance shoe. The gold sandals found near the door of the house were not matched to any footprint evidence at the scene. While Dr. Littlejohn agreed that there appeared to be "some sort of a pattern" on the bloodstained sheet that might be a footprint, she could make no further conclusions. Although she acknowledged that there were tread designs in the sandy ground outside the back gate, as depicted in a photograph of the crime scene, these prints were not closely examined or preserved by the police at the scene. Additionally, because the police, the first responders, and the neighbors had not been asked to provide elimination footprints, Dr. Littlejohn could not rule out that the footprints she examined were left by these individuals.

Despite the lack of physical evidence tying Defendant to the crime, the prosecution offered a great deal of proof about the acrimonious relationship between Defendant and the victim in the weeks and days prior to the murder. The proof indicated that a conflict had arisen because the victim was not turning over to Defendant assets belonging to Mr.

_____

[29] Dr. Chancellor, the medical examiner, had collected nail clippings from the victim's hands; loose hairs found in the victim's hands which appeared to be long and blonde, like that of the victim; and a sexual assault kit. However, this evidence was actually analyzed by the TBI.

[30] See supra text accompanying note 7 for a discussion of the chemical products used at the crime scene.

Hassanieh, Defendant's deceased father. Mr. Sherwood, the victim's half-brother, testified that Defendant told the victim at one point, "[Y]ou know [those were] my father's cars, and the money goes to me." When the victim informed Defendant that any money resulting from Mr. Hassanieh's assets would go into a college account for Defendant or, if she did not go to college, would be used to reimburse the victim for unpaid child support, Defendant's anger increased.

Ms. Shelia Cocke, a neighbor, heard Defendant and the victim arguing outside their house on two occasions. In March 2005, Ms. Cocke heard Defendant twice screaming at the victim, "Just give me the fucking money," to which the victim replied, "Be quiet, Be quiet. Let's get inside." On the second occasion, Ms. Cocke recalled Defendant saying, "Give me the money. I want the money," to which the victim replied, "I will. I will." Ms. Cocke described Defendant as "in a rage" on both occasions. Ms. Hunt also saw Defendant speaking to her mother in a "very disrespectful, ugly" manner in the weeks and months before the murder. On these occasions the victim was quiet or attempted to continue the discussion in private.

The prosecution also offered proof to show that Defendant was angry about the victim's plans to end or curtail Defendant's lifestyle of "partying" with her friends rather than attending to her school work. On May 21, 2005, about a week and a half before the murder, the victim hosted a birthday party at her home for Mr. Sherwood. When Defendant arrived late for the party, the victim accused her of being high and informed Defendant that she was going to start drug testing her.

A few days later, on Memorial Day weekend of 2005, the weekend before the murder, Defendant, the victim, and Mr. Sherwood drove from Memphis to Perry and Winter Park, Florida, for a family reunion and to visit the victim's sister, Ms. Eidson, and her family. According to Mr. Sherwood, during the car ride to Florida the victim told Defendant that she had tested positive for drugs and that they would address the issue later.

When the group arrived at Ms. Eidson's home, the victim told Defendant that she would have to go to boarding or military school or move out of their house. The victim was concerned that Defendant, then eighteen years old but still in eleventh grade, was partying with her friends rather than completing her school work. Defendant responded that she would just join the military. According to Mr. Sherwood's and Ms. Eidson's testimony, tension between the victim and Defendant increased after the victim received a call on Saturday evening from neighbors in Memphis informing her that a group of teenagers were having a party on her property and that the neighbors had called the police. The victim confronted Defendant, who denied any knowledge of the party. The victim suspected Defendant was aware of the party because Defendant's boyfriend, Mr. Brasfield, was caring for the house and

dog while the victim and Defendant were away. The next day, after Mr. Brasfield called the victim and admitted to organizing the party, the victim confronted Defendant again.[31] This time, Defendant admitted that she knew of the party, and a "heated argument" ensued. The two women went upstairs to discuss the matter privately and were not speaking to each other when they came back down. Mr. Sherwood and Ms. Eidson described Defendant after the argument as "clearly upset," "crying," "cold," "distant," and "sad."

Despite the conflict, Mr. Sherwood, the victim, and Defendant left Florida together on Memorial Day 2005. On the drive back to Memphis, the victim, who worked in financial services, received a call from a client about selling a bond. Defendant then asked the victim how bonds worked and how much money she made in such transactions. During the discussion that followed, the victim assured Defendant that she would be well taken care of if anything ever happened to the victim, referring specifically to her life insurance policy and her 401(k) plan, the former of which listed Defendant as a beneficiary and the latter of which listed Defendant as well as Mr. Sherwood as beneficiaries. Before the group arrived in Memphis, the tension between the victim and Defendant had subsided enough that the victim stopped at an outlet mall and bought several items of clothing for Defendant.

However, the conflict heated up again after they arrived home. A couple of days before the murder, Defendant angrily told Mr. Brasfield and another friend that the victim was contemplating taking out a restraining order against Mr. Brasfield. Defendant also informed her friends that her mother was drug testing her and was upset about the party Mr. Brasfield had held at their house.

Numerous friends of Defendant testified to frequent drinking and drug use by Defendant and her social circle, and said the drug use often occurred at Defendant's home, although never when the victim was present.[32] The proof at trial indicated that Defendant's friends regarded the victim as extremely hospitable, explaining that she often entertained and cooked for them in her home. Defendant's friends believed the victim was aware of Defendant's marijuana use because the victim had teased Defendant and a friend for having the "munchies," and implied that it was "not a big deal" when she caught another of

---

[31] Mr. Brasfield testified that no one entered the Jackson residence during the party, and that they remained out in the back yard by the pool. Only he had a key to the house, and he only entered earlier in the day to feed the dog. The dog escaped from the garage, where he had been placed during the party, when someone opened the garage door, but the house itself remained locked. Mr. Brasfield also testified that he "probably" returned the key to Defendant soon after she and the victim returned from Florida, since the victim was very upset with him.

[32] Witnesses testified to Defendant's use of marijuana, alcohol, mushrooms, and Lortabs, as well as a single instance of cocaine use in the two years prior to the murder.

Defendant's friends smoking marijuana in her backyard. Defendant "never really had a curfew set," according to one friend, although Defendant told another friend that she did have a curfew, which she obeyed on some occasions but at other times observed only to sneak out again after returning home.

On Friday June 3, 2005, the weekend of the murder, Defendant went out with friends, including Alexandra Kline. Defendant and Ms. Kline first went to a party with several other teenagers at the unoccupied home of Mr. Kobeck, another acquaintance. The Kobeck family was out of town, and the teenagers entered their house without permission through the garage door. Later, Defendant and Ms. Kline went to the Italian Festival, a street party at a park near the Kobeck home, where Defendant ran into Ms. Giovannetti. Ms. Kline and Ms. Giovannetti testified that they did not see Defendant injure her hand at the Italian Festival, and Ms. Giovannetti said Defendant did not appear intoxicated that night.

Around midday on Saturday, June 4, 2005, Defendant and Ms. Kline drove in Defendant's Jeep Cherokee to their friend Mr. Madison's house, where they swam and "hung out" by the pool while Mr. Madison did yard work. Although the witness testimony varied somewhat, the proof established that sometime between 3:00 and 5:00 p.m., Defendant, accompanied by Mr. Madison, drove Ms. Kline home, where Ms. Kline remained.[33] Defendant and Mr. Madison continued on to Defendant's house. When Defendant noticed her mother's car parked in the driveway, Defendant did not stop at her house and instead drove to the Eastgate shopping center near the Italian Festival to look for parking for the event, believing the victim would be gone by the time she and Mr. Madison returned. However, when they returned, the victim was still at home, so Defendant drove to a house on a nearby street, which had a sign in the yard offering free kittens. After Defendant selected a kitten, they drove back to Defendant's house, arriving sometime after the victim had left at 5:30 p.m. for the wedding. Realizing her mother was no longer home, Defendant stopped at her house, and she and Mr. Madison went inside. While Defendant got ready for the evening, Mr. Madison went into the kitchen, had a beer and a glass of water, played with the kitten, and took a golf club into the back yard and practiced his swing. Mr. Madison testified that he put the golf club back in the bag. Mr. Madison recalled seeing Defendant enter her own room, the hall bathroom, and the victim's room while getting ready for the evening.

After leaving her house, Defendant drove them to a liquor store to buy beer, and they proceeded to Mr. Kobeck's house, which was located near the Italian Festival. When Defendant and Mr. Madison arrived at Mr. Kobeck's house, a party was underway. Various witnesses, including Mr. Madison, Sophie Cooley, Kirby McDonald, Brooke Thompson, Joey

---

[33] Although Defendant called Ms. Kline several times later that night asking her to "come out and party," Ms. Kline refused and did not see Defendant again until after the victim's body was discovered.

McGoff, and Mr. Brasfield, placed Defendant at Mr. Kobeck's house that evening. All of these witnesses testified that the party took place while Mr. Kobeck and his family were out of town, but the testimony conflicted regarding the time Defendant arrived at the party and the duration of the party, as well as if, and when, Defendant went to the Italian Festival on June 4, 2005.

Ms. McDonald, Ms. Thompson, and Ms. Cooley testified that they arrived before Defendant, and they estimated Defendant arrived between 7:30 and 8:00 p.m. Defendant's boyfriend, Mr. Brasfield, also attended the Kobeck party, but he brought another young woman as his date. The record does not indicate whether he arrived before or after Defendant. According to Mr. Brasfield, he and Defendant had a "bad conversation that went sour," and Defendant slapped him when she saw him kissing the other woman.

Mr. Madison testified that he and Defendant stayed at Mr. Kobeck's house for two and a half to three hours, that he drank beer and smoked marijuana, and that he then walked to the Italian Festival with a group of guys. While Defendant did not accompany him, Mr. Madison testified that he saw her there later that evening and talked to her around 10:30 p.m., as he was leaving with someone else. No other witness recalled seeing Defendant at the Italian Festival that night, although Mr. McGoff did recall a group from the Kobeck party going to the Italian Festival that evening.

Several witnesses, including Mr. Madison, Ms. Cooley, Ms. McDonald, Ms. Thompson, and Mr. McGoff, testified to seeing Defendant drinking beer at the Kobeck party. Ms. Cooley testified to seeing Defendant take three Lortab pills at the party as well. These witnesses acknowledged that they were also drinking beer that night, and Ms. McDonald acknowledged taking Xanax.

Multiple witnesses testified as to the clothes Defendant was wearing when she arrived at the Kobeck party. Ms. Cooley described Defendant's clothing as a "yellow tank top with a white out design on the outside of it" and a "long or knee-length skirt and gold sandals with a rhinestone clip." Ms. McDonald said Defendant was wearing a "yellow tank top" and a "long white skirt" that extended to her feet, while Ms. Thompson described Defendant's clothing as a yellow top with "spaghetti straps" and "white flowers" and a "flowy" white skirt that went to just below Defendant's knee. Two pictures taken with cell phone cameras that evening depict Defendant in a yellow and white shirt. Defendant's lower body and skirt are only partially visible in one photograph; the length of the skirt is not depicted in that image. At trial, Ms. Thompson identified the white skirt the police found in Defendant's car as the one Defendant had been wearing at the Kobeck party on June 4, 2005, while Ms. McDonald said it was not the same skirt.

-24-

None of the witnesses who spent time with Defendant on June 3rd and 4th, including Ms. Kline, Mr. Madison, Ms. Cooley, Ms. McDonald, Ms. Thompson, and Mr. Brasfield, recalled seeing a cut or injury on her hand, although Mr. Madison did recall Defendant coming into the Kobeck kitchen and asking for a bandage for one of the young women.[34] Ms. McDonald testified to seeing and touching Defendant's hands at the Kobeck party on Saturday, June 4th, explaining that Defendant had held out her hands to display the French manicure she had obtained earlier in the day. Ms. McDonald said Defendant had no visible injury to her hands at that time. Others, including Ms. Kline and Ms. Thompson, said they would have seen an injury to Defendant's hand because her hands and arms were exposed that day, although Ms. Kline did not recall seeing the injury on Sunday, June 5, 2005, either.

Ms. McDonald also recalled that, after the cell phone photographs were taken at the Saturday, June 4th Kobeck party, Defendant and a group of friends were talking about their mothers. When one friend complimented Defendant's mother as hospitable and nice, Defendant responded, "My mom's a bitch and she needs to go to hell." Defendant said nothing further, and Ms. McDonald assumed that the comment was typical of a "teenager saying something about [her] mom, being in an argument with [her], and being mad."

Eventually, Mr. Kobeck's grandmother discovered the teenagers and broke up the party. The proof is undisputed that Defendant was part of a group that then left the Kobeck house and caravanned in several cars to find a party in the Midtown area. There was conflicting testimony as to whom Defendant rode with, but all witnesses agreed that Defendant rode with friends and did not drive her own vehicle when the caravan left the Kobeck home. Mr. Brasfield testified that at some point during the caravan Defendant switched cars and got into his car, explaining that his other date had left earlier in the evening. When the group arrived in Midtown and discovered that the party they were looking for had ended, they decided to go to Mr. Brasfield's home and continue their party there.

It is unclear when Defendant arrived at the Brasfield party. Ms. Cooley and Ms. McDonald recalled Defendant arriving about 11:00 p.m.—a half hour after they arrived. Ms. McDonald testified that Defendant arrived wearing a skirt and shoes that differed from those she had been wearing at the Kobeck's house, although she was still wearing the same yellow top. Ms. McDonald described the skirt as dark denim and the shoes as black sandals. When

_____

[34] Mr. Madison recalled this request when he was questioned by Defendant's counsel regarding the events of Friday evening, but the context makes it evident that he was referring to the party that took place on the evening of Saturday, June 4th. He admitted to some confusion regarding whether the events occurred on Friday or Saturday. Mr. Madison also testified that no one went inside the Kobeck house on Saturday evening, although photographs taken at the Kobeck house party that night clearly show the interior of a house.

shown a picture of Defendant taken the morning the victim's body was discovered, Ms. McDonald stated that the skirt from the previous night had been a "darker denim skirt," while the skirt Defendant wore that morning was a "whitewashed denim."

After arriving at Mr. Brasfield's house, the group sat in the backyard and talked. Ms. Cooley described Defendant's demeanor as "more quiet than usual" at Mr. Brasfield's house, explaining that Defendant was usually the center of the party, but that night she was "very reserved and quiet and just kind of sitting there." Ms. Thompson recalled Defendant saying repeatedly that she "needed to go home and wanted to go home," which Ms. Thompson described as strange because Defendant ordinarily did not have a curfew. Mr. Brasfield's parents, who were home that night, broke up the party around midnight.

All witnesses testified that Defendant left Mr. Brasfield's house shortly after midnight. Defendant, Ms. Cooley, and Ms. Thompson left with Richard Raines, another friend at the party. Mr. Raines dropped Defendant off at her car, still parked at the Kobeck house, which was about ten to fifteen minutes from Defendant's house. Ms. Thompson testified that when they dropped Defendant off, she was still wearing the same yellow top she had worn to the Kobeck party, but had changed from the white skirt into a short blue jean skirt with a ruffle at the bottom.

Much of the proof at trial focused on establishing Defendant's whereabouts from the time she left the party around midnight until 5:00 a.m. on June 5, 2005. Defendant offered different accounts of her movements to police and friends. In her statement to police, Defendant said that she received a call from the victim at around 12:10 a.m., in which the victim told her to come home and that she was going to bed. Phone records introduced at trial show two calls from the victim's home phone number to Defendant's cell phone: one call at 12:18 a.m., lasting one minute and thirty-nine seconds, and the second call at 12:20 a.m. lasting forty-seven seconds. Defendant also told police that, after picking up her car, she stopped and bought a package of cigarettes. A receipt from the BP station at 4830 Poplar Avenue, a few blocks from Defendant's house, shows a credit card purchase signed for by Defendant at 12:46 a.m.

At 12:59 a.m. Clark Schifani, Defendant's friend, received a hangup call from the victim's and Defendant's home phone number. Mr. Schifani testified that the victim had never called him previously from that number. About ten minutes later, at 1:09 a.m., Mr. Schifani received a call from Defendant's cell phone number, and a voice mail from Defendant. Phone records introduced at trial confirmed Mr. Schifani's testimony and also showed that Defendant had called another friend, Mr. Hammack, from her cell phone at 12:55 a.m.

Mr. Brasfield testified that Defendant called him shortly after leaving the party at his house, wanting to talk about getting back together with him. Mr. Brasfield cut their conversation short, as he and another male friend had plans to rendevous with Ms. Cooley and Ms. Thompson at Ms. Cooley's house.[35] Mr. Brasfield testified that he thought Defendant "was outside smoking a cigarette," but did not state where. Shortly after their conversation, Mr. Brasfield said Defendant sent him a text message on the same topic. Phone records introduced at trial established that Defendant called Mr. Brasfield's cell phone at 1:00 a.m. and that they spoke for approximately two minutes. Defendant called Mr. Brasfield again at 1:06 a.m., and they spoke again for two minutes. Mr. Brasfield denied that Defendant ever spoke to him about a missing wallet that night.

Phone records introduced at trial showed a span of two hours and five minutes—between 1:13 a.m. and 3:18 a.m.—during which time Defendant did not call or text anyone and no witness testified to seeing Defendant. Defendant sent a text message at 1:13 a.m., received a text at 2:11 a.m., and did not text again until 3:34 a.m. No calls were made from Defendant's cell phone between 1:08 a.m., when she called Mr. Schifani, and 3:18 a.m., when she called Eric Whittaker.[36]

Mr. Whitaker testified that early in the morning of June 5th Defendant called him, wanting to come over and hang out. Mr. Whitaker agreed, and he encountered Defendant parked at the end of his driveway a short time later, as he was leaving to drive another friend home. Defendant, who said she had just pulled up, talked to Mr. Whitaker for two to three minutes, declined to ride with him or wait for him to return, and then left.

Video footage from a store security camera of a Walgreens store at the corner of Poplar and Massey, near Defendant's house, showed Defendant entering the store at 4:01 a.m. According to the testimony of the Walgreens clerk on duty at the time, as well as a record of the receipt produced by the store's computer,[37] Defendant purchased Liquid Skin, Nexcare tape, Skin Shield, adhesive tape, and hydrogen peroxide. Defendant also asked the clerk for

---

[35] Mr. Brasfield testified that he and a friend went to Ms. Cooley's house after 1:00 a.m. and remained there until after 5:00 a.m.

[36] Phone records revealed that Defendant called Mr. Whitaker again at 3:40 a.m., and that he called her at 4:12 and 4:36 a.m.

[37] The record of the receipt was generated by Walgreens electronic journal, which logs all store transactions, including items bought as well as the time and date of purchase. The record of the purchase was discovered and printed by Deborah Walls, a Walgreens Assistant Manager, after police provided her with items found in a Walgreens bag in Defendant's Jeep and told her a time frame during which the items likely had been obtained. Defendant's original receipt was never discovered.

a paper towel, which he gave her. Defendant paid $22.55 in cash for these items, and received change of $17.45. Defendant never mentioned going to Walgreens that night to the police or anyone else. Video footage of an All In One store located at 6646 Poplar Avenue showed Defendant purchasing gas with a credit card at 4:20 a.m. Defendant told the police of this stop during her interview with Sergeant Justice on the morning of Sunday, June 5th, and she informed them that they could find the receipt in her purse, which was in police possession at that time.

Although receipts and video footage placed Defendant in close proximity to her house that night, Mr. Hammack was the only witness who testified that Defendant told him she was at her house that morning before the victim's body was discovered. However, Mr. Hammack's testimony at trial regarding his contact with Defendant and activities that night varied from two prior statements he had given to the police, which were disclosed to the defense prior to trial.[38]

In his testimony at trial, Mr. Hammack described his relationship with Defendant as one of "friends with benefits." He testified that he spoke with Defendant at some point between 10 p.m. and midnight on the night of June 4th and that she asked him to meet her at her house.[39] They did not meet, but she called and sent him text messages throughout the night. He testified that he had been at a party with Ryan Grisham, that Mr. Grisham dropped him off at his house around 11:30 p.m., and that Mr. Hammack then drove a friend home around 12:30 a.m. to a location near Defendant's house. Mr. Hammack could not recall exactly, but he testified that he stayed at the friend's house for approximately two hours before heading home. Around 4:00 a.m., Defendant called him again to tell him that she was on her way back from Mr. Whitaker's house and again asked him to meet at her house, a request Mr. Hammack found unusual. He did not go to meet her, he said, because he had been drinking and "couldn't afford a DUI."

On cross-examination, Mr. Hammack confirmed that he had his cell phone with him all night and denied that he left his phone anywhere. He also denied that a friend named "Marcus" was with him that evening. He admitted to heading to a topless bar that night with friends but claimed he decided not to go. Instead, he stated, he bought gas, smoked marijuana, and stopped at Krystal on the way home. Mr. Hammack admitted that he had been

---

[38] Mr. Hammack provided the police a third statement, which differed drastically from his first and second pre-trial statements and his trial testimony, but was not disclosed to the defense prior to trial and as a result was not part of the proof the jury heard. We will address later the content of Mr. Hammack's third statement and the consequences of the prosecution's failure to disclose this evidence.

[39] Records show that Defendant called Mr. Hammack at 12:55 and 3:54 a.m.

"intoxicated" during this time. When he awoke later, he noticed a text sent from Defendant's cell phone at around 5:00 a.m. that said simply, "answer." Mr. Hammack testified that even if phone records showed that Defendant called him repeatedly around 5:00 a.m., he did not remember talking to her.[40] He explained that any discrepancies between his first and second statements were simply the result of his having confused the activities of Friday and Saturday nights—June 3rd and 4th. When asked about the New Balance sneakers friends brought to the police, he testified that they belonged to a housemate and that he put them on because they were by the door and that the sneakers fit him. Mr. Hammack said that he thought he had worn them for the first time when he went to the police station to give a statement after the murder.

Attorneys for the prosecution and the defense presented closing arguments. The defense attorneys objected to a comment the lead prosecutor made at the beginning of final closing argument and moved for a mistrial, arguing that the comment amounted to an improper comment upon Defendant's exercise of her constitutional right to remain silent and not testify at trial. The trial court declined to grant a mistrial and submitted the case to the jury. Based on the foregoing proof, the jury, on February 21, 2009, acquitted Defendant of first degree murder and convicted her of the lesser-included offense of second degree murder.[41]

On February 26, 2009, five days after the jury had returned its verdict and prior to sentencing, the prosecution filed "State's Notice Of Omitted Jencks Statement in Relation To The Testimony Of Andrew Hammack" and attached to it a copy of the third statement Mr. Hammack had given the police on June 13, 2005, approximately one week after his first two statements.[42] Mr. Hammack's third statement was handwritten on the back side of a letter

_____

[40] Phone records show that Mr. Hammack called Defendant at 4:36 a.m. and that the call went to call waiting; they also reveal that Defendant called Mr. Hammack at 4:47, 5:00, 5:01, 5:02, 5:03, and 5:06 a.m. on June 5th and that they exchanged text messages an hour earlier. Mr. Hammack texted Defendant at 3:58; Defendant texted him at 4:04 a.m.; he texted her at 4:09 a.m.; and she texted him at 4:28 and 4:59 a.m.

[41] On March 27, 2009, the trial judge sentenced her as a Range I offender to twenty years and nine months in prison.

[42] In his first statement, Mr. Hammack said that he had been Defendant's boyfriend for three to four months. He said that he talked to Mr. Madison between 4:00-6:00 p.m. on June 4th, while Mr. Madison was driving around with Defendant. Mr. Hammack said he had called Defendant again at some point between 11:00 p.m. and 1:00 p.m., and Defendant told him she was coming back from the party by herself and asked him to meet her at her house in fifteen minutes. Mr. Hammack said he called Defendant again fifteen minutes later when he arrived home, and she told him that she was waiting for him in front of her house. When Mr. Hammack told Defendant he was at his house, Defendant said she was about to go inside her own home and would talk to him later. Mr. Hammack then stated that he sent a text message to Defendant at 3:50

addressed to one of his housemates, gave a completely different account of the early morning hours of June 5th. He recalled going out with three friends—Ian, Jayron, and Marcus—and meeting another friend, Ryan Grisham, at the Paradiso, a movie theater not far from Defendant's house. He then proceeded to get in a car with Ryan and drive to a party, at which point Defendant called Ryan's phone looking for Mr. Hammack, as Mr. Hammack had left his cell phone with Ian. Mr. Hammack remained at the party for a little while but left when Ryan tried to start a fight. The friends got into Mr. Hammack's truck, but Ian drove. Mr. Hammack stated that he wanted to get home because he was "rolling on XTC." At 3:57 a.m., Mr. Hammack and Ian decided to go to a strip club, stopped to get gas, but then decided to return home. They went out once again to visit a friend, but when that friend turned out not to be at his house, they returned home again and fell asleep.

In an affidavit filed along with the notice, the assistant district attorney described the circumstances surrounding his failure to turn over Mr. Hammack's third statement. The assistant district attorney stated that he learned of Mr. Hammack's third statement for the first time on February 15, 2009, while preparing for his direct examination of Detective Miller. The assistant district attorney then requested a copy of the statement and received it on February 17, 2009. Intending to provide the statement to defense counsel at the next opportunity, he placed a copy of it in "the flap of one of the trial notebooks." He stated that he did not provide the lead prosecutor with a copy of the statement, however, even though she was responsible for the direct examination of Mr. Hammack. By the time Mr. Hammack testified on February 19, 2009, the assistant district attorney said he had forgotten about the statement and did not realize his oversight until after the trial had concluded.

Defendant filed a motion for a new trial, raising numerous issues, including her claim that the State's failure to produce Mr. Hammack's third statement violated her right to Due Process. Defendant filed an affidavit in support of the motion in which the defense investigator stated that he had interviewed Ryan Grisham and that Mr. Grisham had confirmed that he was not in Memphis on the weekend in question and was instead visiting the

---

a.m., and she sent him a text back at 4:28 a.m., stating that she was at Mr. Whitaker's house but wanted to meet. At 4:30 a.m., Mr. Hammack replied by text, saying that he wanted to see her too, but instead he went to Krystal, dropped off a friend named "Ian," and went home because he had been drinking. At 5:00 a.m. Defendant sent him a text message that said "answer," but he was already asleep and did not reply.

In his second statement to the police, Mr. Hammack stated that Defendant called him from her home phone number at some point between midnight and 5:00 a.m., but he did not answer. He also claimed that Defendant asked him to meet her outside her house and walk in with her during that time, a request that she had never made of him before. Mr. Hammack also stated that he noticed a cut on Defendant's hand two nights after the murder.

University of Mississippi in Oxford, Mississippi with his parents. The defense also offered the affidavit of Dr. Jonathan J. Lipman, a neuropharmacologist, who described the effect of ecstasy on a person's ability to perceive events accurately. Defendant also filed an affidavit in support of her claim of improper prosecutorial comment on her right not to testify during final closing argument. In this affidavit, defense counsel described the lead prosecutor's actions and voice when delivering the allegedly improper comment.

The trial court denied Defendant's motion for a new trial and, on March 27, 2009, sentenced Defendant to twenty years and nine months on her conviction of second degree murder. Defendant appealed, raising twelve issues. The Court of Criminal Appeals affirmed Defendant's conviction and sentence. State v. Jackson, No. W2009-01709-CCA-R3-CD, 2012 WL 6115084 (Tenn. Crim. App. Dec. 10, 2012). However, the intermediate appellate court was not unanimous as to Defendant's claim that the prosecution improperly commented upon her constitutional right to remain silent and not testify. One member of the panel, who authored the lead opinion, concluded that the lead prosecutor's argument was not improper. Id. at *45. Two other members of the panel, in a separate opinion, concluded that the argument was improper but did not require reversal. Id. at *66-68 (Bivins, J., and Woodall, J., concurring). Defendant then filed a Tennessee Rule of Appellate Procedure 11 application in this Court, which we granted.

### III. Analysis

*A. Improper Prosecutorial Comment Upon Defendant's Fifth Amendment Rights*

Defendant asserts that the lead prosecuting attorney violated her constitutional right against self-incrimination when the lead prosecutor began final closing argument by walking across the court room, facing Defendant, and declaring in a loud voice, while raising both arms to point at and gesture toward Defendant, "Just tell us where you were! That's all we are asking, Noura!" Defendant contends that the lead prosecutor's statement, body language, and tone of voice could only have been understood as a command for Defendant to tell the jury where she was on the night of the murder. Defendant avers that the trial court erred by denying her motion for mistrial, made immediately after this statement. Although a majority of the Court of Criminal Appeals' panel determined that the lead prosecutor's argument was improper, Defendant argues that the majority applied an incorrect, non-constitutional standard when assessing the effect of the constitutional error. Defendant claims that the incorrect standard relieved the State of its burden to prove the error harmless beyond a reasonable doubt and shifted to Defendant the burden of proving prejudice. Defendant contends that the error was not harmless beyond a reasonable doubt; as a result, Defendant asserts that she is entitled to a new trial.

The State responds that the lead prosecutor's argument was not improper but was instead a summation of trial testimony. Even assuming the argument was improper, the State contends that Defendant is not entitled to a new trial because the error was harmless beyond a reasonable doubt.

The Fifth Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment, Malloy v. Hogan, 378 U.S. 1, 6 (1964), provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Article I, section 9 of the Tennessee Constitution similarly provides that "the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. These constitutional provisions guarantee criminal defendants the right to remain silent and the right not to testify at trial. Carter v. Kentucky, 450 U.S. 288, 305 (1981) ("The freedom of a defendant in a criminal trial to remain silent unless he chooses to speak in the unfettered exercise of his own will is guaranteed by the Fifth Amendment . . . ." (quoting Malloy, 378 U.S. at 8)); Momon v. State, 18 S.W.3d 152, 162 (Tenn. 1999).

In 1965, the United States Supreme Court held that the Fifth Amendment right against self-incrimination prohibits prosecutorial comment upon a defendant's decision not to testify at trial and precludes a jury from drawing an adverse inference of guilt from a defendant's decision not to testify. Griffin v. California, 380 U.S. 609 (1965). In Griffin, the prosecutor emphasized during closing argument that the defendant, who chose not to testify at trial, had been with the victim just prior to her murder and had "not seen fit to take the stand and deny or explain." Id. at 610-11. The trial court instructed the jury that, although the defendant had a constitutional right not to testify, the jury could draw an inference unfavorable to the defendant as to facts within his knowledge about which he chose not to testify. Id. at 610. The jury convicted the defendant of first degree murder; however, the Supreme Court reversed the conviction, holding "that the Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." Id. at 615. The Court characterized comment on a defendant's right to remain silent and not testify as a "remnant of the inquisitorial system of criminal justice" and "a penalty imposed by courts for exercising a constitutional privilege." Id. at 614 (citations and internal quotation marks omitted).

The concepts Griffin announced were not new in this State. Long before Griffin, Tennessee courts had interpreted article I, section 9, together with a state statute, as precluding the prosecution from commenting on a defendant's decision not to testify at trial. See Act of March 4, 1887, ch. 401, sec. 2, 1887 Tenn. Pub. Acts 158 ("[T]he failure of the parties defendant to make such request and to testify in his own behalf, shall not create any presumption against him."); Staples v. State, 14 S.W. 603, 603 (Tenn. 1890); see also Tenn. Code Ann. § 40-17-103 (2012) ("The failure of the party defendant to make a request to

-32-

testify and to testify in the defendant's own behalf shall not create any presumption against the defendant."). This Court reiterated the importance of this principle thirty years ago, when it reversed a conviction based on a prosecutor's statement advising the jury *not* to consider the defendant's silence at trial against him. State v. Hale, 672 S.W.2d 201, 203 (Tenn. 1984). In so holding the Court cautioned that "[t]he subject of a defendant's right not to testify should be considered off limits to any conscientious prosecutor." Id. (internal quotation marks omitted).[43]

More recent decisions have clarified the scope of the federal and state constitutional prohibition against prosecutorial comment on a defendant's exercise of the right not to testify.[44] For example, in Lockett v. Ohio, 438 U.S. 586 (1978), the Supreme Court held that a prosecutor's characterization of the State's evidence as "unrefuted" or "uncontradicted" does not necessarily amount to a comment on the defendant's constitutional right not to testify, where defense counsel had already drawn the jury's attention to the defendant's right to remain silent. Id. at 595; see also State v. Copeland, 983 S.W.2d 703, 709 (Tenn. Crim. App. 1998) (holding that a prosecutor may describe the proof as uncontradicted in certain circumstances).[45] Similarly, in United States v. Robinson, 485 U.S. 25 (1988), the Supreme Court held that, after defense counsel stated that the government had not afforded his client an opportunity to tell his side of the story, Griffin did not preclude the prosecutor from reminding the jury that the defendant could have testified. Id. at 32-34. The Robinson Court emphasized that, unlike the argument and instructions in Griffin, the prosecutor's comment did not treat the defendant's silence as "substantive evidence of guilt" but was a "fair response" to defense counsel's claim. Id. at 32; see also State v. Cazes, 875 S.W.2d 253, 267 (Tenn. 1994) (applying Robinson to reject a Griffin claim).

---

[43] Likewise, evidence or argument about a defendant's post-arrest, post-Miranda silence is impermissible. See Doyle v. Ohio, 426 U.S. 610, 617, 619 (1976) (stating that post-arrest silence in the wake of Miranda warnings "is insolubly ambiguous" and may be nothing more than the arrestee's exercise of Miranda rights and holding that "the use for impeachment purposes of [an arrestee's] silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment").

[44] This Court is the final arbiter of the Tennessee Constitution and may interpret its provisions differently than the corresponding provisions of the United States Constitution. State v. Watkins, 362 S.W.3d 530, 554 (Tenn. 2012). To date, the parameters of the state constitutional right have been interpreted co-extensive with the federal constitutional right.

[45] We note, however, that a prosecutor's comments on the absence of any contradicting evidence may be viewed as an improper comment on a defendant's exercise of the right not to testify when the defendant is the only person who could offer the contradictory proof. See, e.g., United States v. Sandstrom, 594 F.3d 634, 662-63 (8th Cir. 2010); State v. Whitaker, 277 P.3d 392, 399 (Idaho Ct. App. 2012).

Although prosecutorial responses to defense arguments are clearly permitted, Griffin, Hale, Staples, and their progeny continue to impose an absolute prohibition on prosecutorial comment in the absence of defense argument. Indeed, in Mitchell v. United States, 526 U.S. 314 (1999), the Supreme Court expressly declined to adopt an exception to Griffin which would have allowed a judge to draw an adverse inference from a defendant's silence at sentencing. Id. at 328-30. Writing for the Court, Justice Kennedy explained that "[t]he concerns which mandate the rule [of Griffin] against negative inferences at a criminal trial apply with equal force at sentencing." Id. at 329. The Griffin rule, he wrote, "has become an essential feature of our legal tradition" and a "vital instrument for teaching that the question in a criminal case is not whether the defendant committed the acts of which he is accused," but "whether the Government has carried its burden to prove its allegations while respecting the defendant's individual rights." Id. at 330.

Furthermore, although Griffin, Hale, and Staples involved direct comments on the constitutional right to remain silent and not testify, "indirect references on the failure to testify also can violate the Fifth Amendment privilege." Byrd v. Collins, 209 F.3d 486, 533 (6th Cir. 2000); see Felts v. State, 354 S.W.3d 266, 282 n.10 (Tenn. 2011); Morris v. State, 537 S.W.2d 721, 723-24 (Tenn. Crim. App. 1976); see also State v. Rutledge, 66 P.3d 50, 55 (Ariz. 2003) (en banc); State v. Hodges, 671 P.2d 1051, 1055 (Idaho 1983); People v. Bannister, 902 N.E.2d 571, 593-94 (Ill. 2008).

As the Court of Criminal Appeals has eloquently explained:

There are ways other than by direct assertion to make a point with an audience. Sometimes it is more effective to get across a message in a negative manner. By telling the Romans over and over again that Brutus was an honorable man, Mark Anthony, in his oration at Caesar's funeral, skillfully and thoroughly convinced them that Brutus was a dishonorable traitor and murderer and turned them into a raging [m]ob.

Morris, 537 S.W.2d at 723.

Most federal and state courts have adopted a two-part test for ascertaining whether a prosecutor's remarks amount to an improper comment on a defendant's exercise of the constitutional right to remain silent and not testify. Smith v. State, 787 A.2d 152, 161-62 (Md. 2001) (Battaglia, J., concurring) (collecting federal and state cases). This two-part test inquires: (1) whether the prosecutor's manifest intent was to comment on the defendant's right not to testify; or (2) whether the prosecutor's remark was of such a character that the jury would necessarily have taken it to be a comment on the defendant's failure to testify. Id.; see also United States v. Morris, 533 F. App'x 538, 543 (6th Cir. 2013); United States v.

-34-

Rodriguez-Velez, 597 F.3d 32, 44 (1st Cir. 2010). The United States Supreme Court has never expressly approved this test, although Justice Stevens alluded to it approvingly in a separate opinion in United States v. Hasting, 461 U.S. 499, 515 n.6 (1983) (Stevens, J., concurring).

No prior Tennessee decision has adopted the two-part majority test or enunciated another test for ascertaining when a prosecutor's comment amounts to a constitutional violation. Although a minority of states have adopted a different test,[46] we conclude that the two-part test applied by the majority of jurisdictions is appropriate for Tennessee and therefore adopt it.

Before utilizing this test to evaluate Defendant's claim, we must first determine the standard of appellate review applicable to such claims. Although courts in other jurisdictions differ in their characterization of the issue, with some describing it as a question of law and others describing it as a mixed question of law and fact, courts typically apply de novo review when addressing this issue. See Robinson, 485 U.S. at 31-34; Rodriguez-Velez, 597 F.3d at 44 (describing the issue as a question of law to which de novo review applies); United States v. Gardner, 396 F.3d 987, 988-89 (8th Cir. 2005) (describing the issue as a mixed question of law and fact to which de novo review applies); United States v. Layne, 192 F.3d 556, 579 (6th Cir. 1999) (same). Again, no prior Tennessee decision has enunciated the applicable standard of appellate review for a defendant's claim of impermissible prosecutorial comment on the right not to testify. In practice, however, Tennessee courts have applied de novo review when considering such claims. See, e.g., Cazes, 875 S.W.2d at 266-67; State v. Thornton, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); Thompson v. State, 958 S.W.2d 156, 168 (Tenn. Crim. App. 1997). We agree that de novo review is the proper standard and apply it here, along with the two-part test, to determine (1) whether the prosecutor's manifest intent was to comment on Defendant's right not to testify; or (2) whether the prosecutor's remark was of such a character that the jury would necessarily have taken it to be a comment on Defendant's decision not to testify.

We have considered the allegedly improper remark and the context in which it was made, as well as defense counsel's contemporaneous comments and subsequent affidavit describing the lead prosecutor's body language and the tone and volume of her voice when making the remark. We have also considered the trial court's descriptions of the allegedly

---

[46] Three states have adopted a "fairly susceptible" test, which requires a finding of a constitutional violation whenever a prosecutor makes a statement that a jury may reasonably interpret as an invitation to draw an adverse inference from a defendant's silence. See State v. DiGuilio, 491 So.2d 1129, 1135-36 (Fla. 1986); Moore v. State, 669 N.E.2d 733, 739 (Ind. 1996); Smith, 787 A.2d at 156.

improper argument at trial and during the hearing on the motion for new trial.[47] We conclude that, regardless of the lead prosecutor's intent, the lead prosecutor's remark was of such a character that the jury would necessarily have taken it to be a comment on Defendant's exercise of her constitutional right not to testify.

The record belies the State's assertion that the trial court correctly characterized the lead prosecutor's argument as a permissible summation of the trial testimony of Defendant's aunt, Ms. Eidson. As the majority in the Court of Criminal Appeals explained, the lead prosecutor's argument differed significantly from this testimony.[48] Furthermore, the lead prosecutor included no prefacing language to signal that the argument was a summation of trial testimony, nor was the lead prosecutor's statement phrased in a manner to suggest that it was a summation of trial testimony. Instead, the lead prosecutor's argument was phrased in the first person plural and as a demand that Defendant explain herself. The lead prosecutor's actions before and during the argument reinforced this perception. For example, the lead prosecutor walked across the court room, stood in front of Defendant, gestured toward her, and demanded in a loud voice, "Just tell us where you were! That's all we are asking, Noura!" The lead prosecutor's word choice, specifically the plural pronouns "us" and "we" and the present tense verb, communicated to the jury that the lead prosecutor was speaking directly to Defendant on behalf of everyone in the court room. The prosecutor's language also conveyed the message that asking Defendant to explain her whereabouts was entirely reasonable and the least Defendant could do if she expected to be acquitted of the crime. The lead prosecutor's argument thus implicitly encouraged the jury to view Defendant's silence as a tacit admission of guilt. Regardless of the lead prosecutor's intent, we conclude that the lead prosecutor's remark was of such a character that the jury would necessarily have taken it to be a comment on Defendant's exercise of her constitutional right not to testify.

Given that "[t]he impropriety of any comment upon a defendant's exercise of the Fifth Amendment right not to testify is so well settled as to require little discussion," Ledford v. State, 568 S.W.2d 113, 116 (Tenn. Crim. App. 1978), it is not at all clear why any prosecutor would venture into this forbidden territory. As the Court of Criminal Appeals cautioned more

---

[47] In adjudicating this issue, we have not considered as evidence the media videotape of the prosecutor's comment, which defense counsel was permitted to play during oral argument before this Court. See Tenn. Sup. Ct. R. 30(I) ("Impermissible Use of Media Material. None of the film, videotape, still photographs, or audio recordings of proceedings under this rule shall be admissible as evidence in the proceeding out of which it arose, any proceedings subsequent and collateral thereto, or upon any retrial or appeal of such proceeding.").

[48] Ms. Eidson testified that she told Defendant, "Noura, tell me where you were and who were you with when Jennifer was murdered." Defendant responded, "I don't know. I don't know."

than thirty years ago, "[r]emarks which skirt the edges of impermissible comment are neither desirable nor worth the risk of reversal of what may well be a thoroughly deserved conviction." Taylor v. State, 582 S.W.2d 98, 101 (Tenn. Crim. App. 1979) (quoting State v. Dent, 241 A.2d 833, 840-41 (N.J. 1968)); see also Lyons v. State, 596 S.W.2d 104, 107 (Tenn. Crim. App. 1979) ("We . . . echo the trial judge's warning to the prosecutor concerning the unnecessary and wholly gratuitous risk involved in any comment on the defendant's valued right to decide whether he will testify or not, as well as the exercise of that decision."); McCracken v. State, 489 S.W.2d 48, 51 (Tenn. Crim. App. 1972) ("Even in a case . . . where the evidence of guilt is clearly made out we would not hesitate to reverse and remand if we thought an argument, however subtle and indirect, told the jury it could infer the accused was guilty because he did not take the witness stand.").

While "closing argument is a valuable privilege that should not be unduly restricted," State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001), we emphasize again that comment upon a defendant's exercise of the state and federal constitutional right not to testify should be considered "off limits to any conscientious prosecutor." Hale, 672 S.W.2d at 203 (internal quotation marks omitted).[49] As the United States Supreme Court has explained:

> [A prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, [a prosecutor] is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. [A prosecutor] may prosecute with earnestness and vigor—indeed, he [or she] should do so. But, while [a prosecutor] may strike hard blows, he [or she] is not at liberty to strike foul ones.

Berger v. United States, 295 U.S. 78, 88 (1935); see also Manning v. State, 257 S.W.2d 6, 9 (Tenn. 1953) (recognizing that a prosecutor should vigorously prosecute offenders and

---

[49] The prosecutor in Shelby County is doubtless well aware of these principles. See State v. Thomas, 158 S.W.3d 361, 414 (Tenn. 2005) (finding that the prosecutor's repeated characterizations of defendants as "greed" and "evil" personified were "improper" and "unseemly"); State v. Talley, No. W2003-02237-CCA-R3-CD, 2006 WL 2947435, at *18 (Tenn. Crim. App. Oct. 16, 2006) (finding that the prosecutor's comments characterizing defendants as "hatred, vengeance and evil" were "improper" and "designed to inflame the passions and prejudices of the jury"); State v. Bond, No. W2005-01392-CCA-R3-CD, 2006 WL 2689688, at *8-9 (Tenn. Crim. App. Sept. 20, 2006) (finding that the prosecutor's remarks blaming the defendant for the lengthy trial and jury sequestration were "improper" insofar as they asked the jury to penalize the defendant for exercising his constitutional right to a jury trial).

represent the State "impartially in the interest of justice"); Watkins v. State, 203 S.W. 344, 345 (Tenn. 1918) (recognizing that in a criminal case "[t]he vindication of justice, not of advocacy, is the true concern").

Our conclusion that the lead prosecutor's argument was constitutionally impermissible does not, however, end the inquiry. We must also consider whether the State has established that this constitutional error was harmless beyond a reasonable doubt. This Court has identified three categories of error: (1) structural constitutional error; (2) non-structural constitutional error; and (3) non-constitutional error. State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008). These categories are "more than academic" because the standard an appellate court uses to determine whether an error is harmless differs significantly depending on the type of error. Id.

Structural constitutional errors involve "defects in the trial mechanism" which "compromise the integrity of the judicial process itself." Id. Such errors defy harmless error analysis and always require reversal. State v. Climer, 400 S.W.3d 537, 569 (Tenn. 2013); Momon, 18 S.W.3d at 164-66 (listing examples of structural constitutional errors).

However, non-structural constitutional errors do not require automatic reversal. Chapman v. California, 386 U.S. 18, 24 (1967); Rodriguez, 254 S.W.3d at 371; State v. Transou, 928 S.W.2d 949, 960 (Tenn. Crim. App. 1996); Lyons, 596 S.W.2d at 107. Indeed Chapman, the landmark case enunciating the constitutional harmless error doctrine, involved Griffin error. Chapman, 386 U.S. at 24. Although reversal is not mandatory for non-structural constitutional errors, to avoid reversal, the State bears the burden of demonstrating that the error is harmless beyond a reasonable doubt. Chapman, 386 U.S. at 24; Rodriguez, 254 S.W.3d at 371.

The effect of non-constitutional errors is determined by using the standard provided in Tennessee Rule of Appellate Procedure 36(b). Rodriguez, 254 S.W.3d at 371-72. Under this standard, a defendant bears the burden of establishing "that the error 'more probably than not affected the judgment or would result in prejudice to the judicial process.'" Id. at 372 (quoting Tenn. R. App. P. 36(b)).

Because the standards differ fundamentally, a court must carefully identify the type of error at issue before undertaking an evaluation of its effect. Climer, 400 S.W.3d at 569 n.18. We agree with Defendant that the Court of Criminal Appeals incorrectly applied the standard for non-constitutional errors when assessing the effect of the non-structural constitutional error in this case. We reiterate that Griffin errors are of constitutional dimension, and when determining whether such errors require reversal, courts must apply the Chapman standard for non-structural constitutional errors, which places the burden on the State to prove

harmlessness beyond a reasonable doubt. When assessing whether the State has met its burden, courts should consider the nature and extensiveness of the prosecutor's argument, the curative instructions given, if any, and the strength of the evidence of guilt.[50] Transou, 928 S.W.2d at 960; Lyons, 596 S.W.2d at 107; see also Bowling v. Parker, 344 F.3d 487, 514 (6th Cir. 2003).

In this case, defense counsel's appropriately swift objection precluded the lead prosecutor from making extensive remarks, but the impermissible comment came at a critically important juncture in the trial—the prosecution's final, rebuttal argument to the jury. The defense had no opportunity to respond to the argument. The lead prosecutor's verbally and physically forceful delivery of the remark imbued it with a potential for prejudice greater than would ordinarily be ascribed to a single remark made during a lengthy trial. Although the trial court appropriately provided curative instructions, in the context of this case, the instructions likely served to emphasize further Defendant's exercise of her constitutional right

---

[50] When evaluating an improper prosecutorial argument that does not rise to the level of a constitutional violation, the test to be applied is "whether the improper conduct could have affected the verdict to the prejudice of the defendant." Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965). In answering this question, courts consider the following five factors: (1) the conduct complained of, viewed in light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. See State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984) (adopting the five-factor analysis enunciated in Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)). There is some overlap between these five factors and the analysis a court should employ when addressing a defendant's claim of unconstitutional prosecutorial comment upon a defendant's right not to testify. For instance, the conduct complained of and the intent of the prosecutor are relevant in both instances to determining whether a prosecutor's comments are improper. Factors two and five are relevant in both instances to determining the prejudicial effect or harmfulness of prosecutorial comments.

We recognize that the Court of Criminal Appeals has used the five Judge factors when adjudicating claims of unconstitutional prosecutorial comment on a defendant's right not to testify as well as claims of improper prosecutorial argument. See, e.g., State v. Flinn, No. E2009-00849-CCA-R3-CD, 2013 WL 6237253, at *73 (Tenn. Crim. App. Dec. 3, 2013); State v. Becton, No. W2011-02565-CCA-R3-CD, 2013 WL 967755, at *23 (Tenn. Crim. App. Mar. 11, 2013). To avoid blurring the lines between improper prosecutorial argument and unconstitutional prosecutorial comment, the Judge factors should only be applied to claims of improper prosecutorial argument. Limiting their application in this manner will preserve the crucially important distinction between the two claims, which is that the State bears the burden of proving unconstitutional prosecutorial comment or argument harmless beyond a reasonable doubt, whereas a defendant bears the burden of proving prejudice when prosecutorial argument is merely improper. Rodriguez, 254 S.W.3d at 371-72.

not to testify, much like the lead prosecutor's argument did in <u>Hale</u>, 672 S.W.2d at 203.[51] Finally, the evidence of guilt in this case was entirely circumstantial and, while sufficient to support the conviction, cannot be described as overwhelming. The lead prosecutor's remark implicitly invited the jury to consider Defendant's silence and exercise of her constitutional right not to testify as additional evidence of the State's theory that Defendant committed the murder. Considering the record in this appeal, we are constrained to conclude that the State has failed to establish that the lead prosecutor's constitutionally impermissible argument was harmless beyond a reasonable doubt. At Defendant's new trial, the prosecution must refrain from directly or indirectly commenting on Defendant's state and federal constitutional right to remain silent and not to testify.

Our conclusion that the lead prosecutor's unconstitutional argument was not harmless beyond a reasonable doubt and requires reversal of Defendant's conviction would ordinarily be the end of our analysis of this appeal. However, as explained below, the record on appeal also establishes that the prosecution violated Defendant's right to Due Process. This separate and flagrant violation of Defendant's constitutional rights also merits our consideration and independently entitles Defendant to a new trial.

---

[51] The trial court instructed the jury, in relevant part, as follows:

> All right, ladies and gentlemen, I want to make a distinction here so you'll understand. I have given you in your jury instructions and you will get in your copy of the instructions, but to make sure that there's no confusion, the following instruction, which I will re-read to you, which you were discussed [sic] when we picked the jury last Monday. Defendant not testifying. The defendant has not taken the stand to testify as a witness, but you shall place no significance on this fact. The defendant is presumed innocent and the burden is on the State to prove her guilt beyond a reasonable doubt. She is not required to take the stand in her own behalf and her election not to do so cannot be considered for any purpose against her, nor can any inference be drawn from such fact. Now, when [the lead prosecutor] opened her argument, she was not at all discussing or asking Miss Jackson a question. What she is doing, and she will explain to you, is that she was quoting another witness and commenting on the proof of the case that Miss Jackson, a witness who testified to something about Miss Jackson being asked where she was. It's very important for all of you to understand that you cannot ever, ever, hold anything against Miss Jackson for not testifying in this trial. Also, at any time from the time of this alleged killing until today, Miss Jackson never has to talk to anyone about anything. She has an absolute right to remain silent and it's up to the State to prove her guilt beyond a reasonable doubt. It's not up to anyone to prove that they're innocent. Can every one of you follow that instruction? And I want to see every head. Can you, sir? (The jury was polled and each juror indicated an affirmative response.) Okay. I'm going to allow [the lead prosecutor] to continue with this argument, but I want everybody to understand that when she says this phrase, she's not asking Miss Jackson that question now about -- commenting at all about her right not to testify. She is talking about proof in the case.

## B. Prosecution's Failure to Produce Evidence

Defendant claims that the prosecution violated her constitutional right to Due Process, and in particular the principles announced in Brady v. Maryland, 373 U.S. 83 (1963), by failing to provide to the defense Andrew Hammack's third statement to the police until after the trial. The defense points out that, despite multiple and specific pre-trial requests for any statements Mr. Hammack had given the police, and a mid-trial request for Brady materials, the prosecution did not provide Mr. Hammack's third statement until after the trial.

The State concedes that the prosecution did not produce Mr. Hammack's third statement in a timely manner. The State argues, however, that Defendant is not entitled to relief because the prosecution's timely production of the statement would not have affected the outcome of the trial.

"[T]he Due Process Clause of the Fourteenth Amendment requires that criminal prosecutions 'comport with prevailing notions of fundamental fairness.'" State v. Ostein, 293 S.W.3d 519, 535 (Tenn. 2009) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)); see also State ex rel. Anglin v. Mitchell, 596 S.W.2d 779, 786 (Tenn. 1980) (recognizing that article I, section 8 of the Tennessee Constitution guarantees criminal defendants the right to a fair trial). "[T]his standard of fairness requires that criminal defendants 'be afforded a meaningful opportunity to present a complete defense.'" Ostein, 293 S.W.3d at 535 (quoting Trombetta, 467 U.S. at 485). To effectuate this right, a body of law has developed recognizing "'what might loosely be called the area of constitutionally guaranteed access to evidence.'" Id. (quoting United States v. Valenzuela–Bernal, 458 U.S. 858, 867 (1982)). One of the foundational principles of this area of the law is that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87.

"[E]vidence favorable to an accused," id., also encompasses evidence relevant to the impeachment of prosecution witnesses. United States v. Bagley, 473 U.S. 667, 676 (1985); Giglio v. United States, 405 U.S. 150, 154 (1972); Johnson v. State, 38 S.W.3d 52, 55-57 (Tenn. 2001); State v. Walker, 910 S.W.2d 381, 389 (Tenn. 1995). "'[E]vidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness'" falls within the Brady disclosure requirement. Johnson, 38 S.W.3d at 56-57 (quoting Commonwealth v. Ellison, 379 N.E.2d 560, 571 (Mass. 1978)).

Moreover, so long as the evidence qualifies as favorable to the accused, the Brady duty of disclosure applies, irrespective of the admissibility of the evidence at trial. Johnson, 38 S.W.3d at 56. Furthermore, Brady applies not only to evidence in the prosecution's possession, but also to "'any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" Strickler v. Greene, 527 U.S. 263, 275 n.12 (1999) (quoting Kyles v. Whitley, 514 U.S. 419, 437 (1995)); see also Sample v. State, 82 S.W.3d 267, 270-71 n.3 (Tenn. 2002); Johnson, 38 S.W.3d at 56.

To establish a Due Process violation based on Brady, a defendant must show that: (1) the defendant requested the evidence (unless the evidence is obviously exculpatory, in which case the prosecution is bound to produce the information, without a request); (2) the State suppressed evidence in its possession; (3) the suppressed evidence was favorable to the defendant; and (4) the evidence was material. Johnson, 38 S.W.3d at 56; State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995); Walker, 910 S.W.2d at 389; State v. Evans, 838 S.W.2d 185, 196 (Tenn. 1992).

The record in this appeal demonstrates that Defendant satisfied the first requirement of a Brady claim by requesting, on March 9 and March 23, 2007, any statements Mr. Hammack had provided to the State. Defendant identified Mr. Hammack as the suspect from whom the police had taken fingerprints and a DNA sample. In two pre-trial hearings, the defense sought to compel the prosecution to produce evidence related to Mr. Hammack, including statements to the police, which were specifically referenced. At least four pre-trial hearings were held on defense motions to compel production of Brady materials in general. The defense renewed its request for Brady materials at trial. Thus, the record clearly demonstrates that the defense requested Brady materials and specifically requested any statements Mr. Hammack had given to the police.

Second, the record also shows that Mr. Hammack's third statement was in the prosecution's possession. Mr. Hammack gave the statement to the police on June 13, 2005, long before Defendant's trial. Although the prosecution apparently did not obtain a copy of the statement from the police until midway through Defendant's trial, the Brady duty of disclosure applies even to evidence in police possession which is not turned over to the prosecution. Kyles, 514 U.S. at 438; Johnson, 38 S.W.3d at 56. The record is thus undisputed that, for purposes of Brady, the prosecution had Mr. Hammack's third statement in its possession from June 13, 2005, and actually had the statement in its physical possession before Mr. Hammack testified, but did not provide the statement to the defense. Defendant has therefore established the second element of her Brady claim.

Defendant has also established the third element of her Brady claim because Mr. Hammack's third statement qualifies as impeachment evidence favorable to Defendant.

Bagley, 473 U.S. at 676. Mr. Hammack's third statement differed from the accounts he had given in his first and second statements. Only in his third statement did Mr. Hammack confess that he was "rolling on XTC" on the night of the murder. The State does not dispute that this portion of the third statement referred to Mr. Hammack's use of the drug ecstasy. It was also only in his third statement that Mr. Hammack reported leaving his telephone in a friend's car on the night of the murder. When asked during cross-examination if he had left his phone anywhere on the night of the murder, Mr. Hammack denied doing so. Had the third statement been provided, the defense could have used it to impeach Mr. Hammack's testimony that he received text messages and telephone calls from Defendant on the night of the murder. Regardless of which, if any, of Mr. Hammack's statements are true, the third statement clearly provided relevant impeachment evidence. As such, it qualified as evidence favorable to the defense for purposes of the third Brady requirement.

The success of Defendant's Brady claim thus turns on the fourth element, which requires us to determine whether Mr. Hammack's third statement was material. Favorable evidence is considered material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Edgin, 902 S.W.2d at 390 (quoting Kyles, 519 U.S. at 433, 435); see also Johnson, 38 S.W.3d at 58. The Supreme Court in Kyles discussed materiality at length and reiterated four key points. 514 U.S. at 434-37. First, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." Id. at 434; see also Johnson, 38 S.W.3d at 58. Second, determining materiality is not the equivalent of determining the legal sufficiency of the evidence. Kyles, 519 U.S. at 434-35. Third, where a defendant establishes materiality, along with the other three elements necessary to show a Brady violation, the defendant also has inherently established that the violation was not harmless; thus, a separate harmless error analysis is unnecessary and inappropriate. Id. at 435; see also Johnson, 38 S.W.3d at 63; State v. Biggs, 218 S.W.3d 643, 660 (Tenn. Crim. App. 2006). Fourth, the materiality of suppressed evidence should be "considered collectively, not item by item." Kyles, 519 U.S. at 436. In this way, the prosecutor's responsibility is "to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached." Id. at 437.

> [The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

Id. at 434 (quoting Bagley, 473 U.S. at 678); see also Johnson, 38 S.W.3d at 58. Failing to disclose Brady materials may impair the adversary process in various ways, including causing the defense to "abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued." Bagley, 473 U.S. at 682. A defendant seeking to establish materiality should call to the attention of the reviewing court any and all ways in which suppression of evidence impaired the adversary process and undermined confidence in the outcome of the proceeding.

Applying these principles, we conclude that Mr. Hammack's third statement was material because it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." See Kyles, 514 U.S. at 435; see also Johnson, 38 S.W.3d at 58. Again, the third statement differed significantly from Mr. Hammack's first two statements and his trial testimony. Although Mr. Hammack's first two statements differed from each other in certain respects, Mr. Hammack explained these differences at trial by saying that he had confused the events of Friday and Saturday night. Had the third statement been produced, its very existence could have undercut Mr. Hammack's innocent explanation for the discrepancies between his first two statements. Additionally, the defense could have used the discrepancies among all three statements and Mr. Hammack's admitted use of ecstasy to undercut Mr. Hammack's credibility and cast doubt on his mental capacity to perceive and remember the night of the murder.

The defense also could have used the disclosure in Mr. Hammack's third statement that he had left his phone in someone else's vehicle to counter Mr. Hammack's damaging testimony that Defendant called and asked, for the first time in their acquaintance, to meet her at her house and "walk in" with her. Mr. Hammack is the only witness who stated that Defendant called and told him that she was at her and the victim's house during the period when the murder likely occurred; therefore, his testimony was critical in placing her at the scene of the crime. It is difficult to overstate the importance of this portion of Mr. Hammack's testimony, and without the suppressed third statement, the defense had little means of countering it.

The defense also could have used Mr. Hammack's third statement to bolster its attack upon the thoroughness of the police investigation and to argue that Mr. Hammack himself was a plausible suspect. Testifying at the hearing on the motion for new trial, Lt. Miller conceded that the police failed to contact the alibi witnesses named in Mr. Hammack's third statement. One of these alibi witnesses was Mr. Grisham. According to an affidavit of the defense investigator offered in support of the motion for new trial, had the police contacted Mr. Grisham, they would have learned that he was out of the state with his parents on the weekend in question. The defense then could have argued that Mr. Hammack was without a consistent alibi for crucial periods of the night, consistent with a report from his housemates that they could not account for Mr. Hammack's activities throughout the night of the crime. Lt. Miller

had testified at trial that the housemates went to the police station not long after the murder to report Mr. Hammack's late arrival home and strange behavior since the murder. They brought with them and turned over to the police the New Balance sneakers Mr. Hammack had worn since the night of the murder. Mr. Hammack's housemates viewed this conduct as odd because the shoes did not belong to him and did not fit him. In his testimony, however, Lt. Miller described the housemates as "slightly incoherent" and "high" and discounted their report, saying that they were "rambling" and "it was obvious that they had been sitting around coming up with conspiracy theories." The police instead chose to credit Mr. Hammack's assertion that his housemates had gotten the nights confused when they reported his late arrival home. The sneakers in question were simply photographed and returned without any further testing. The defense could have used the third statement to cast further doubt on Lt. Miller's characterization of the housemates' statements, and thus the thoroughness of the police investigation, and thereby cast suspicion on Mr. Hammack for the crime.

The various ways in which the defense could have used Mr. Hammack's third statement are significant because the proof against Defendant was entirely circumstantial and, although sufficient to support the conviction, cannot be described as overwhelming. No physical evidence tied her to the crime, despite the array of physical evidence removed from the scene for analysis. Defendant did not confess to committing the crime, although she did make contradictory statements to family, friends, and the police. The defense theory that one or more other persons perpetrated the crime found support in the results of DNA testing, which revealed the DNA of at least one unknown person mixed with that of the victim. Finally, the third statement would have enabled the defense to impeach the only prosecution witness whose testimony placed Defendant at her home during the time period the prosecution alleged the murder occurred. The importance of this third statement is clear. "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence . . . ." Napue v. Illinois, 360 U.S. 264, 269 (1959).

> Every experienced trial judge and trial lawyer knows the value for impeaching purposes of statements of the witness recording the events before time dulls treacherous memory. Flat contradiction between the witness' testimony and the version of the events given in his reports is not the only test of inconsistency. The omission from the reports of facts related at the trial, or a contrast in emphasis upon the same facts, even a different order of treatment, are also relevant to the cross-examining process of testing the credibility of a witness'[s] trial testimony.

Jencks v. United States, 353 U.S. 657, 667-68 (1957). The defense is in the best position to determine the most effective impeachment use of a witness's statement. Id. at 668-69. "When the reliability of a witness may well be determinative of guilt or innocence, the non-disclosure

of evidence affecting his credibility may justify a new trial, regardless of the good or bad faith of the prosecutor." State v. Williams, 690 S.W.2d 517, 525 (Tenn. 1985).[52] Given the importance of Mr. Hammack's testimony to the prosecution's case and the manner in which the defense could have used his third statement to cast the proof at trial in a different light, we have no hesitation in concluding that Mr. Hammack's third statement was material.

By establishing the materiality of Mr. Hammack's third statement, and the other three requirements necessary to show a Brady violation, the defendant has established that this constitutional violation was not harmless. Kyles, 514 U.S. at 435; Johnson, 38 S.W.3d at 63; Biggs, 218 S.W.3d at 660. Thus, we conclude that this separate Brady violation also entitles Defendant to a new trial.

Our determination that Defendant has established a Brady violation obviates the need to address the prosecutor's violation of Tennessee Rule of Criminal Procedure 26.2.[53] See

---

[52] By our holding we do not disturb the trial court's finding that the prosecutor did not intentionally withhold Mr. Hammack's third statement. We observe, however, that this is not the first time prosecutors in the Thirtieth Judicial District have withheld evidence that should have been disclosed. See, e.g., State v. Coleman, No. W2001-01021-CCA-R3-CD, 2002 WL 31625009, at *9 (Tenn. Crim. App. Nov. 7, 2002) (stating that the prosecution offered an "untimely revelation" of an oral statement defendant made to the police, resulting in a thirty-day continuance); Roe v. State, No. W2000-02788-CCA-R3-PC, 2002 WL 31624850, at *11 (Tenn. Crim. App. Nov. 20, 2002) (stating that the prosecution improperly withheld information favorable to the defendant, although no Brady violation resulted as the information was not material).

[53] Tennessee Rule of Criminal Procedure 26.2 provides:

(a) Motion for Production. After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony.

(b) Production of Statement.

(1) *Entire Statement*. If the entire statement relates to the subject matter of the witness's testimony, the court shall order that the statement be delivered to the moving party.

. . . .

(c) Recess for Examination of Statement. The court may recess the proceedings to allow time for a party to examine the statement and prepare for its use.

Tenn. R. Crim. P. 26.2(a), (b)(1), (c).

State v. Caughron, 855 S.W.2d 526, 534-35 (Tenn. 1993) (discussing the history and the adoption of Rule 26.2). Had the prosecutor merely complied with Rule 26.2 by turning over the third statement after Mr. Hammack's direct examination, Defendant may well have been hard pressed to establish a Brady violation. Compliance with constitutional and procedural rules is crucial because "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair[,]" and "the administration of justice suffers when any accused is treated unfairly." Brady, 373 U.S. at 87-88; see also Stokes v. State, 64 Tenn. 619, 622 (1875) ("Although we might be satisfied of the prisoner's guilt, yet it is our duty to see that he has a fair and impartial trial, and this he must have though costs may accumulate and punishment be long delayed.").

In this case, the lead prosecutor unconstitutionally commented upon Defendant's exercise of her constitutional right not to testify, and the prosecution violated Brady and Defendant's right to Due Process by failing to turn over Mr. Hammack's third statement. Neither of these constitutional violations was harmless beyond a reasonable doubt. Thus, we are constrained to vacate Defendant's conviction and remand for a new trial. In order to give the trial court further guidance on remand, we will now discuss Defendant's claims that: (1) certain portions of Genevieve Dix's testimony should have been excluded based on the attorney-client privilege; and (2) the trial court improperly admitted prior bad acts evidence consisting of Defendant's drug and alcohol use. Given our reversal and remand for a new trial, we need not address Defendant's challenge to the propriety of her sentence.

## C. Attorney-Client Privilege

Defendant argues that the trial court erred in ruling that the attorney-client privilege did not apply to the communications between Defendant and attorney Genevieve Dix. The State argues that the trial court properly credited Ms. Dix's testimony that she informed Defendant and the police at the scene that she was not acting as Defendant's attorney.

The general rule is that all relevant evidence should be made fully available to the trier of fact. Neil P. Cohen et al., Tennessee Law of Evidence § 5.11[2] (6th ed. 2011). Therefore, Tennessee Rule of Evidence 501 "limits the ability of parties and witnesses to refuse to disclose information or documents to the 'privileges' provided by the constitution, statutes, common law, and rules promulgated by the Tennessee Supreme Court." Boyd v. Comdata Network, Inc., 88 S.W.3d 203, 212 (Tenn. Ct. App. 2002). The attorney-client privilege, recognized both at common law and by statute, is the oldest privilege in this State and one a witness may invoke. Tenn. Code Ann. § 23-3-105 (2009);[54] Tenn. Sup. Ct. R. 8, RPC 1.6, 1.18; Johnson v. Patterson, 81 Tenn. 626, 649 (1884); McMannus v. State, 39 Tenn. 213, 215-

---

[54] The statute in effect at the time of the crime in 2005 is identical to the current statute.

16 (1858). Its purpose is "to encourage full and frank communication between attorneys and their clients . . . ." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981); see also State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Grp. Trust, 209 S.W.3d 602, 615-16 (Tenn. Ct. App. 2006); Boyd, 88 S.W.3d at 212. In criminal cases, the privilege is integral to a defendant's constitutional rights against compulsory self-incrimination and to the effective assistance of counsel. Fisher v. United States, 425 U.S. 391, 403-05 (1976); Bryan v. State, 848 S.W.2d 72, 79 (Tenn. Crim. App. 1992).

The statutory attorney-client privilege, originally enacted in 1821, is now codified at Tennessee Code Annotated section 23-3-105, which provides:

No attorney, solicitor or counselor shall be permitted, in giving testimony *against a client or person who consulted the attorney, solicitor or counselor professionally*, to disclose any communication made to the attorney, solicitor or counselor as such by such person during the pendency of the suit, before or afterward, to the person's injury.

(Emphasis added). The statutory language and longstanding Tennessee law require a showing that the attorney was "applied to for advice or aid in his professional character . . . ." Jackson v. State, 293 S.W. 539, 540 (Tenn. 1927); McMannus, 39 Tenn. at 216. The person claiming the benefit of the privilege must "establish the communications were made pursuant to the attorney-client relationship and with the intention that the communications remain confidential." Culbertson v. Culbertson, 393 S.W.3d 678, 684 (Tenn. Ct. App. 2012) (quoting State ex rel. Flowers, 209 S.W.3d at 615-16); see also Smith Cnty. Educ. Ass'n v. Anderson, 676 S.W.2d 328, 332 (Tenn. 1984). "The attorney-client relationship is consensual and, significantly, it 'arises only when *both the attorney and the client have consented* to its formation.'" Akins v. Edmondson, 207 S.W.3d 300, 306 (Tenn. Ct. App. 2006) (quoting Torres v. Divis, 494 N.E.2d 1227, 1231 (Ill. 1986)). An attorney-client relationship does not arise unless the potential client has a reasonable expectation that the lawyer is willing to assent to the formation of the relationship. See Tenn. Sup. Ct. R. 8, RPC 1.18, cmt. 2 ("Duties to Prospective Client") (explaining that "a person who communicates information unilaterally to a lawyer, without any reasonable expectation that the lawyer is willing to discuss the possibility of forming a client-lawyer relationship, is not a 'prospective client' . . . ."); see also Togstad v. Vesely, 291 N.W.2d 686, 693 n.4 (Minn. 1980) (stating that an attorney-client relationship arises when a person "seeks and receives legal advice from an attorney in circumstances in which a reasonable person would rely on such advice") (citations omitted) (internal quotation marks omitted). Restatement (Third) of the Law Governing Lawyers, Section 14, similarly states:

A relationship of client and lawyer arises when:

(1) a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person; and either

(a) the lawyer manifests to the person consent to do so; or

(b) the lawyer fails to manifest lack of consent to do so, and the lawyer knows or reasonably should know that the person reasonably relies on the lawyer to provide the services; or

(2) a tribunal with power to do so appoints the lawyer to provide the services.

Restatement (Third) of the Law Governing Lawyers § 14 (2000).

Where, as here, an attorney is also a friend of the potential client, "the lawyer-friend must be giving advice as a lawyer and not as a friend in order for the privilege to attach." Jones v. United States, 828 A.2d 169, 175 (D.C. Cir. 2003); see also Ellis v. State, 20 S.W. 500, 505 (Tenn. 1892) (refusing to apply the privilege where an attorney had a conversation with a defendant and was afterward asked by the defendant's father to stay the night and represent the defendant if he were arrested, but the attorney declined the invitation); United States v. Tedder, 801 F.2d 1437, 1441-43 (4th Cir. 1986) (holding that where a defendant confided in a friend who was also a partner at his law firm and whose family members were charged in the same matter, no attorney privilege applied); Prichard v. United States, 181 F.2d 326, 328-30 (6th Cir. 1950) (holding that where a person consults with an attorney in his capacity as a friend, the privilege does not apply); Lanci v. Arthur Andersen LLP, No. 96 CIV. 4009(WK), 1998 WL 409776, at *1 (S.D.N.Y. July 21, 1998) ("[T]he privilege does not apply if the lawyer is acting as a friend, relative, accountant or agent." (quoting Joseph M. McLaughlin, 3 Weinstein's Federal Evidence, § 503.13[3][a] (2d ed. 1998)); G & S Invs. v. Belman, 700 P.2d 1358, 1365 (Ariz. Ct. App. 1984) ("The privilege does not apply where one consults an attorney not as a lawyer but as a friend or business advisor."). "Speaking in confidence is not enough; 'where one consults an attorney not as a lawyer but as a friend or as [an] . . . adviser . . ., the consultation is not professional nor the statement privileged.'" State v. Gordon, 692 A.2d 505, 507 (N.H. 1997) (alterations in original) (quoting K. Broun et al., McCormick on Evidence § 88, at 322-24 (J. Strong ed., 4th ed. 1992)).

The trial court here was tasked with determining the "[p]reliminary questions concerning . . . the existence of" the attorney-client privilege. Tenn. R. Evid. 104(a). Defendant had the burden of proving these preliminary facts by a preponderance of the evidence. State v. Stamper, 863 S.W.2d 404, 406 (Tenn. 1993) ("[T]he appropriate standard

of proof for preliminary facts required for the admission of evidence is proof by a preponderance of the evidence."). The trial court's factual findings will be upheld on appeal unless the evidence in the record preponderates against them. State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); see also Jones, 828 A.2d at 174 (quoting United States v. Evans, 113 F.3d 1457, 1461 (7th Cir. 1997)) (stating that a trial court's findings of fact regarding the elements of the attorney-client privilege, including its formation, will not be overturned unless clearly erroneous, placing a heavy burden on the defendant); Gordon, 692 A.2d at 506-07 (stating that the applicability of the attorney-client privilege rests in the sound discretion of the trial court to which deference is owed unless no reasonable jurist could have reached the same conclusion).

In this case, Ms. Dix testified that she told Defendant on more than one occasion that she was not acting as Defendant's attorney and was present at the scene because of her friendship with the victim, not as an attorney. Defendant, in contrast, testified at the jury-out hearing that she spoke with Ms. Dix because she knew Ms. Dix was an attorney. Defendant denied that Ms. Dix told her she was not acting as her attorney. The trial court accredited Ms. Dix's testimony, and the proof does not preponderate against the trial court's finding. In light of Ms. Dix's repeated statements to Defendant that she was not acting as her attorney, the trial court's finding that Defendant had no reasonable belief or expectation that Ms. Dix had assented to the formation of an attorney-client relationship is not clearly erroneous.

### D. Evidence Regarding Drug and Alcohol Use

Finally, Defendant argues that the trial court improperly admitted evidence from twelve witnesses regarding Defendant's drug and alcohol use before and after the murder. We note that the trial court acknowledged the requirements of Tennessee Rule of Evidence 404(b) in determining the admissibility of the evidence of Defendant's drug use and instructed the jury

to limit its consideration of the evidence to motive.[55]  However, as we have previously observed in another context,

> the Rule 404(b) criteria—in particular, the existence of a material issue at trial and the balancing of the probative value and unfair prejudice—require consideration of the evidence presented at trial.  Thus, trial courts must be cognizant that if pretrial evidentiary rulings are made, they may need to be reconsidered or revised based on the evidence presented at trial.

State v. Gilley, 173 S.W.3d 1, 6 (Tenn. 2005).  Similarly, at Defendant's new trial, the trial court must again apply Rule 404(b), and Tennessee decisions interpreting it, to determine anew the admissibility of evidence of Defendant's drug and alcohol use.  In doing so, it must recognize, of course, that Defendant's acquittal of first degree murder means that premeditation will not be an issue at the new trial.  See State v. Burns, 979 S.W.2d 276, 291 (Tenn. 1998) (recognizing that implied acquittal occurs and bars retrial on the acquitted offense when a jury is given a full opportunity to return a verdict on the charged offense and instead finds the defendant guilty of a lesser-included offense).

In general, we caution that courts should take a "restrictive approach" to evidence admitted under Rule 404(b) as it "carries a significant potential for unfairly influencing a jury." State v. Dotson, 254 S.W.3d 378, 387 (Tenn. 2008) (quoting State v. Bordis, 905 S.W.2d 214, 227 (Tenn. Crim. App. 1995)).  "[S]uch evidence easily results in a jury improperly convicting

---

[55] Tennessee Rule of Evidence 404(b) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait.  It may, however, be admissible for other purposes.  The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming to a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

a defendant for his or her bad character or apparent propensity or disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial." Id. at 387 n.7 (quoting State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994)); State v. Mallard, 40 S.W.3d 473, 488 (Tenn. 2001). "'[T]he risk that a jury will convict for crimes other than those charged—or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment—creates a prejudicial effect that outweighs ordinary relevance.'" State v. Sexton, 368 S.W.3d 371, 403 (Tenn. 2012) (quoting Old Chief v. United States, 519 U.S. 172, 181 (1997)). The Rules also permit exclusion if a "needless presentation of cumulative evidence" will occur. Tenn. R. Evid. 403; Wade v. State, 914 S.W.2d 97, 102 (Tenn. Crim. App. 1995).

In this case, the trial court repeatedly permitted the introduction of evidence concerning Defendant's alcohol use, drug use, and sex life. For example, Ms. Kline was permitted to testify that she and Defendant once drank beer while at a party on a friend's farm during the summer after the murder. In addition, at least six different friends were permitted to testify regarding specific and repeated instances of Defendant's drug use. Mr. MacDonald was permitted to testify to Defendant's use of marijuana dating back to her sophomore year in high school, at least one year prior to the date of the murder, and four other witnesses—Ms. Cooley, Ms. Madison, Mr. McGoff, and Mr. Brasfield—repeatedly testified to similar behavior. Perry Brasfield was permitted to testify that after the murder, Defendant came to his house, climbed up to his bedroom window, and had sex with him in his room. He also testified that he had sex with her in her apartment. The prejudicial effect of this evidence may well have outweighed its probative value. In the future, the trial court must carefully consider the probative value of such testimony in relation to its prejudicial effect upon a jury, especially in the context of a new trial in which a first degree murder charge is not at issue.

## IV. Conclusion

We reverse, in part, the judgment of the Court of Criminal Appeals, vacate Defendant's conviction, and remand for further proceedings consistent with this opinion. Costs of this appeal are taxed to the State of Tennessee, for which execution may issue if necessary.

_____
CORNELIA A. CLARK, JUSTICE